**NATIONAL LEASED HOUSING ASSO-CIATION, and 189 named Plain-tiffs, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 95–5069.

United States Court of Appeals, Federal Circuit.

Jan. 30, 1997.

1424

Charles L. Edson, Peabody & Brown, Washington, DC, argued, for plaintiffs-appellants. With him, on the brief, were Harry J. Kelly and Richard M. Price.

John E. Kosloske, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued, for defendant-appellee. With him, on the brief, were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director.

Before RICH, Circuit Judge, NIES *, Senior Circuit Judge, and PLAGER, Circuit Judge.

* Senior Circuit Judge Nies participated at oral argument but died before the opinion was issued.

The case was decided by the remaining judges in accordance with Fed. Cir. Rule 47.11.

PLAGER, Circuit Judge.

In this appeal from an adverse judgment of the Court of Federal Claims,[1] plaintiffs challenge the Government's administration of Section 8 of the United States Housing Act of 1937, as amended, codified at 42 U.S.C. § 1437f (1994). Section 8 provides government rent subsidies for low income individuals and families living in non-government-owned housing. The Court of Federal Claims, Judge Andewelt, in a series of thoroughly-considered opinions spanning a period of four years, dealt with a multiplicity of issues raised, and finally concluded that plaintiffs, a large group of developers and present and former owners of rental housing projects, were not entitled to the relief they sought. On appeal, plaintiff-appellants, now consisting of the National Leased Housing Association and 189 named individuals and organizations, present six issues for decision.[2] Before addressing the several contentions raised by appellants, we give a summary of the lengthy history of the case.

## BACKGROUND

### A.

This case originated in the late 1980's, when the Court of Federal Claims consolidated several cases pending in that court because of the common issues presented.[3] As noted, the instant appeal is on behalf of 190 plaintiffs (collectively referred to herein as "plaintiffs" or "appellants"). Each of the plaintiffs is a current or former owner of privately owned rental properties. Each entered into a long-term Housing Assistance Payment Contract ("HAP contract") to provide subsidized housing to low-income tenants pursuant to the provisions of Section 8. Some of the plaintiffs contracted directly with the federal Department of Housing and Urban Development ("HUD") while some, subject to the approval of HUD, contracted with a local public housing agency ("PHA"), which itself had contracted with HUD.

Congress in 1974 enacted Section 8 in order to aid "low-income families in obtaining a decent place to live." 42 U.S.C. § 1437f(a) (1994). Under Section 8, tenants make rental payments according to their income and ability to pay and HUD (or the PHA as the case may be) makes up the difference between that payment and a "contract rent" specified by the HAP contract. This contract rent, as adjusted from time to time as required by Section 8, therefore determines the amount of rent the landlord is due. It is the manner in which this contract rent, once established, is adjusted that is the subject of these disputes.

The contract rent is initially set by HUD to approximate the fair market value of the rental property for the local area (called "Fair Market Rentals" or "FMRs"). To establish the FMR, HUD conducts a survey of at least 12 recently constructed projects within the relevant market area. HUD sets the FMRs by determining the 75th percentile of comparable rent levels for that area and then trends the rent data ahead two years to reflect anticipated changes in those levels. *See National Leased Housing Ass'n v. United States*, 22 Cl.Ct. 649, 656–7 (1991) (describing the initial rent determination process). The initial contract rent, however, is not necessarily set equal to the FMR. Modest adjustments may be made in the initial contract rent to reflect additional costs, such as the provision of facilities for handicapped or elderly tenants, associated with complying with Section 8 requirements. *See* 42 U.S.C. § 1437f(c)(1) (1994).

Once the initial contract rent is set, HUD is required to adjust at least annually the maximum monthly rents for units covered by the contracts. The statute provides:

---

**1.** *National Leased Housing Ass'n v. United States,* 32 Fed. Cl. 762, 765 (1995).

**2.** The Government in its brief on appeal identifies nine separate issues for decision. Since the Government did not cross-appeal, we will confine ourselves to deciding the issues raised by appellants.

**3.** The present case consists of four separate cases filed in the Court of Federal Claims: No. 6–87C—filed on January 9, 1987; no. 324–87C—filed June 4, 1987; no. 204–88C—filed March 29, 1988; and no. 90–6C—filed January 2, 1990. Case no. 6–87C was designated the lead case, presumably since it was the furthest along, and all others were consolidated therewith in response to plaintiffs' motion to consolidate.

The assistance contract shall provide for adjustments annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.

Section 8(c)(2)(A), 42 U.S.C.. § 1437f(c)(2)(A) (1994).[4]

This annual adjustment requirement of Section 8 is implemented through a provision in the HAP contracts referred to as Section 1.8b. That section provides:

(b) *Automatic Annual Adjustments.*

(1) Automatic Annual Adjustment Factors ["AAAFs"] will be determined by HUD at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by HUD where utilities are paid directly by Families.

(2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable [AAAF] most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted rents be less than the Contract Rents on the effective date of the Contract.[5]

The AAAFs are set by HUD based upon certain broad economic indices, the Consumer Price Index and the Bureau of the Census American Housing Surveys. There is an AAAF for each of four census regions, the States of Alaska and Hawaii, and seventy two metropolitan areas. *See generally National Leased Housing Ass'n v. United States,* 22 Cl.Ct. 649, 657 (1991).

There are limits, however, to these adjustments. The statute provides for the following limitation:

Adjustments in the maximum rents ... shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

Section 8(c)(2)(C), 42 U.S.C. § 1437f(c)(2)(C) (1994). Consistent with this, the HAP contracts also provide an "Overall Limitation" section that implements, and tracks in part the language of, this section of the statute. Section 1.8d of the HAP contract provides:

d. *Overall Limitation.* Not withstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

It is this last contract section that is at the heart of the present controversy.

### B.

About 1981 HUD began to suspect that in some areas the AAAF adjusted rents were outpacing rents for comparable unassisted units. Prior to that time HUD routinely had been granting the full AAAF adjustment each year. In order to bring the contract rents back in line with those for comparable rents HUD began selectively conducting comparability studies to determine the prevailing rent for comparable unassisted units. HUD then used the results of these studies to cap the rents paid to affected Section 8 owners, relying on the authority of the Overall Limitation provision in section 1.8d of the contracts. Not surprisingly, the owners were not pleased with this change, and this suit to determine the validity of the process arose.

This suit, though a case of first impression in this court, was not the first to address the

---

4. The language of the statute at the time the contracts were entered into was essentially the same. Therefore we will refer to the current version of the statute.

5. This is from a 1976 version of the HAP contract. In 1980 a different version of the contract was used. These differences, however, are not significant for purposes of the present discussion.

issues raised. The first case out of the box was decided by the Ninth Circuit in 1988. In *Rainier View Assocs. v. United States*, 848 F.2d 988 (9th Cir.1988), that court held that subsection (c)(2)(A) of Section 8, the subsection quoted above, gave HUD two options. One was to base the periodic adjustments to contract rents on actual changes in the housing market through market surveys; the other was to base them on a "reasonable formula." Since HUD, by adoption of the AAAFs as provided in section 1.8b of the HAP contracts, had indicated its intention to use a formula approach, it could not later change its mind and use surveys as a basis for adjusting the rents. *Id.* at 991. Accordingly, capping the rents paid to the landlords based on actual market surveys was held unlawful. The landlords were deemed to be due the full amounts authorized by the AAAFs. The Supreme Court denied certiorari. *United States v. Rainier View Assocs.*, 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1989). In response, the Government announced its intention not to honor the position of the Ninth Circuit outside that circuit; and this litigation proceeded apace.

Plaintiffs in their case before the Court of Federal Claims stood essentially on the position taken by the Ninth Circuit. Meanwhile, the issue of whether HUD could base its rent adjustments on both AAAFs and, when thought necessary, market surveys of the local area, or whether the contracts required HUD to utilize only the formula method, finally made it to the Supreme Court in 1993 in another case from the Ninth Circuit, *Alpine Ridge Group v. Kemp*, 955 F.2d 1382 (9th Cir.1992), *rev'd sub nom. Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). But that gets us ahead of the story of this appeal. For that story we turn to the series of decisions below, out of which this appeal comes.

## (1) NLHA I

In the first of its four opinions, *National Leased Housing Ass'n v. United States*, 22 Cl.Ct. 649 (1991) (*NLHA I*), the Court of Federal Claims (then the United States

Claims Court [6]) considered the Government's contention that Section 801 of the Department of Housing and Urban Development Reform Act of 1989 ("HUD Reform Act"), Pub.L. No. 101–235, 103 Stat. 2057, repealed that court's jurisdiction under the Tucker Act. The Tucker Act grants the Court of Federal Claims jurisdiction over contract suits against the United States. *See* 28 U.S.C. § 1491. Section 801, enacted in 1989 in large part in response to the Ninth Circuit's decision in *Rainier View*, explicitly provides that HUD, after issuing appropriate regulations, can conduct comparability studies as part of the process of periodic adjustment of the contract rents. 42 U.S.C. § 1437f(c)(2)(C) (1994).

In an apparent attempt to mollify the landlords, section 801 also provided a limited damages provision for those owners whose contract rents had been reduced in the past by the use of comparability studies. The damages provision entitled the property owners to 30% of the difference between the contract rent paid and the full AAAF adjusted rent. *Id.* The Government argued that Section 801 "represents a precisely drawn, detailed statute" that replaced the judicial remedy provided by the Tucker Act, and thus impliedly repealed the Court of Federal Claims' jurisdiction under that Act. The court rejected the argument. Rather, the court concluded, Section 801 was intended merely as a formula to calculate, and limit, damages under the statute. Accordingly, the court denied the government's motion to dismiss for lack of jurisdiction.

The trial court preliminarily considered the central issue in the case, whether, independent of section 801, HUD had the right to modify the periodic rent adjustments dictated by the AAAFs based on the results of comparability studies. (The issue of whether the 1989 amendment could constitutionally apply to pre-existing contracts was being separately litigated in the Ninth Circuit's *Alpine Ridge* case.) The trial court concluded that the "Overall Limitation" provision contained in section 1.8d of the HAP contracts, quoted above, gave HUD such power.

---

**6.** *See Court of Federal Claims Technical and Procedural Improvement Act of 1992, Pub.L. 102–* 572, 106 Stat. 4516 (changing the court's name to the Court of Federal Claims).

*NLHA I*, 22 Cl.Ct at 656. In reaching this conclusion the trial court expressly disagreed with the Ninth Circuit's reading of the same provision in *Rainier View*.[7]

### (2) NLHA II

Having failed in their attempt to challenge HUD's ability to use comparability studies, the plaintiffs mounted three procedural challenges to HUD's use of those studies. In its second opinion, the Court of Federal Claims considered and rejected each of these procedural challenges. *National Leased Housing Ass'n v. United States*, 24 Cl.Ct. 647 (1991) (*NLHA II*).

The plaintiffs argued below that the procedures used to conduct and implement the comparability studies violated the Due Process and Equal Protection clauses of the Constitution, the Administrative Procedure Act ("APA"), and the Freedom of Information Act ("FOIA"). Realizing that the Court of Federal Claims cannot adjudicate these claims directly, plaintiffs couched their claims as one of breach of contract rather than a violation of these clauses and statutes directly. In essence, they argued that HUD was contractually obligated to comply with the APA, FOIA, and with the requirements of Due Process and Equal Protection in making its adjustments. Failure to do so produced a breach of contract for which plaintiffs were entitled to relief. *NLHA II*, 24 Cl.Ct. at 650–51.

The trial court first addressed what, if anything, would be the plaintiffs' damages assuming they could make out a breach of contract on one of these grounds. The plaintiffs contended that they were entitled to the full AAAF adjusted rents and, therefore, their damages would be the difference between the actual rents paid and the full AAAF adjusted rents. That was the solution employed in the Ninth Circuit. *See Alpine Ridge Group v. Kemp*, 764 F.Supp. 1393, 1403 (W.D.Wash.1990) (court ordered HUD

to "pay plaintiffs the AAAF rents wrongfully withheld"). The trial court rejected this conclusion. Instead, the court concluded that the plaintiffs are entitled only to rents that do not materially differ from those of comparable unassisted units. *NLHA II*, 24 Cl.Ct. at 651.

The trial court then considered each of the procedural requirements individually. The court held that there was no due process violation because of the availability of post-adjustment procedures to challenge the comparability studies, and found that HUD was not contractually obligated to comply with the APA or FOIA under contracts entered into prior to August 1980.[8] Further, the court summarily dismissed an equal protection challenge on the ground that selective enforcement does not amount to impermissible discrimination. *NLHA II*, 24 Cl.Ct. at 652–8.

### (3) NLHA III

The plaintiffs fit into one of two categories: those who contracted directly with HUD to provide Section 8 housing and those who contracted directly with a local public housing authority. The Government moved to dismiss the claims brought by those plaintiffs who contracted with a PHA, and not directly with HUD, on the ground that the Court of Federal Claims lacked jurisdiction under the Tucker Act because there was no privity of contract between those contract claimants and the United States Government. The plaintiffs responded that the PHAs were, for purposes of these contracts, agents of the Federal Government, and on basic agency principles the Government was liable to plaintiffs.

In the third of its four decisions, the court ruled that the two tier structure, in which the Government contracted with the PHAs and the PHAs contracted with the plaintiffs, insulated the Government from suit by the plain-

---

7. The Court of Federal Claims left open the question of whether the government was precluded from relitigating this issue based on the results in *Rainier View*. This issue was mooted by the Supreme Court's decision in *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) [hereinafter *Alpine Ridge*].

8. The court requested further briefing on the issue of whether the APA or FOIA applies to post-August 1980 contacts. *NLHA II*, 24 Cl.Ct. at 658. Section 4, *infra*, discusses the court's treatment of the post-August 1980 contracts.

tiffs. *National Leased Housing Ass'n v. United States*, 32 Fed. Cl. 454, 471 (1994) (*NLHA III* ). In reaching this conclusion the court relied on cases in this court and in its predecessor court dealing with the analogous situation of contracts for development of publicly-owned low income housing, in which the same two tier structure was utilized, and regarding which the courts had held there was no privity of contract between the developers and the Government. The trial court also rejected the plaintiffs' arguments that these property owners were "third party beneficiaries" of the HUD–PHA contracts, which contracts when approved by the Government authorize the PHAs to enter into the HAP contracts with the property owners.

The court also considered two more issues, both of which are here on appeal. The first is whether the "Overall Limitation" gives HUD the authority to reduce rents below the prior year's contract rent based on the results of the comparability study. Plaintiffs argued that the Overall Limitation provision only gave HUD the power to reduce the present year's "adjustment," not independently cap rents at that level dictated by the comparability study when that cap was below the prior year's contract rent. The court rejected that argument. *NLHA III*, 32 Fed. Cl. at 464–5.

The other issue addressed in *NLHA III* concerned the proper interpretation of the proviso in the Overall Limitation provision that states: "provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences existed with respect to the initial Contract Rents." Plaintiffs contended that this provision required HUD to maintain a *percentage* differential between the contract rent and the comparable unassisted rents, as determined by the comparability studies, while the Government argued that the difference should be measured in dollar terms.

To illustrate, if the initial contract rent was $500 and the rent of a comparable unassisted unit was $400, the plaintiffs argued that HUD in any future adjustment must maintain a 25% difference (i.e., ($500–$400) / $400 = 25%) between the adjusted contract rents and the rent of comparable unassisted housing. In contrast, the Government argued that the initial difference is a fixed dollar amount. Thus, in the example, HUD must simply maintain a $100 difference (i.e., $500–$400 = $100) between the adjusted contract rent and the rent of comparable unassisted housing. Over time, and as rents increase significantly, the difference between the rent due an owner under the plaintiffs' theory of how to measure "difference" and the Government's could be quite sizable. For various reasons the trial court found the meaning of the term "difference" as used in the contract to be more likely the meaning preferred by the Government, *NLHA III*, 32 Fed. Cl. at 468, and so held.

## (4) NLHA IV

In its final opinion, *National Leased Housing Ass'n v. United States*, 32 Fed. Cl. 762, 765 (1995) (*NLHA IV* ), the Court of Federal Claims revisited an issue deferred in *NLHA II*. That issue was whether the post-August 1980 contracts required HUD to comply with certain rulemaking and publication requirements pursuant to Section 1.1(g) of the HAP contract. That section now provided:

> Neither party is bound by any representations or agreements of any kind except as contained in this Contract, *any applicable regulations,* and agreements entered into in writing by the parties which are not inconsistent with this Contract.

(Emphasis added).

The pre-August 1980 contracts did not include the "any applicable regulations" limitation. The plaintiffs argued that the addition of the "any applicable regulations" language meant that HUD intended to include as part of the contracts the specific requirements found in two general regulations that governed HUD's administrative activities, found in 24 C.F.R. §§ 10.1 and 15.11. The former requires "notice and comment" procedures for all "HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or *contracts,*" 24 C.F.R. § 10.1 (1988) (emphasis added), while the latter requires publication in the Federal Register of "substantive rules of general ap-

plicability adopted as authorized by law, and statements of general policy or interpretations of general applicability," 24 C.F.R. § 15.11 (1988). That court rejected such a broad reading of the clause. The court noted that on page one of the contracts there was provision for the contracting parties to select from a list of regulatory schemes ("New Construction" (Part 880), "Substantial Rehabilitation" (Part 881), and "State Housing Agencies" (Part 883)). The court ruled that the "any applicable regulations" provision in the contract referred only to the regulations governing those specific programs.

Since there were no remaining issues to be decided, and the parties agreed that summary judgment was appropriate, the Court of Federal Claims gave final judgment for the Government. This appeal followed.

## DISCUSSION

As noted, not all of the many issues involved in understanding the case and that were decided by the trial judge are before us. The plaintiff-appellants raise six issues on appeal. These six are: (1) whether their due process rights were violated by the way the Government proceeded to make these periodic rent adjustments; (2) in making them, whether the Government was obligated to comply with the APA and FOIA; (3) whether the Government, under any theory of the contract provisions, in making an annual adjustment could lower rents below that of the preceding year; (4) whether the "differences" that must be maintained under the proviso in section 1.8d of the contracts is measured in dollars or in a percentage; (5) the proper measure of damages for the Government's breaches; and (6) whether there is privity of contract with the Government for those who contracted through a PHA. In view of our disposition of the other issues, it is unnecessary for us to reach the fifth issue raised, that of the proper measure of damages. The other issues will be addressed seriatim.

### (1) Due Process

Appellants argue that property owners under these HAP contracts have the right to receive a factor-based rent adjustment, that is, the adjustment authorized by the AAAFs, in the absence of a legally valid comparability study indicating otherwise. Since in appellants' view the comparability studies utilized by HUD are so "procedurally invalid"—by which it would appear they mean poorly done—as to be legally null and void, any adjustment based on these studies is a denial of the property owners' due process rights.

The Government responds with a two-part argument. First, the property right of these plaintiffs is not to a rent adjustment based on the AAAFs, but only to a rent adjustment that gives them a rent not materially different than the rent charged for comparable unassisted units. Second, procedural due process requires that some form of hearing be granted before an individual is finally deprived of a property interest, but that the particular form of hearing is a matter open to considerable administrative flexibility. In the case of these landlords, ample opportunity exists for property owners to secure review of the periodic rent increases through existing procedures in HUD, and, if not satisfied, ultimately through appeal to the courts. Furthermore, argues the Government, the demand by appellants that there be detailed, nationwide standards for these studies is unwarranted in view of the standards already incorporated in the statute.

■ It is difficult to know what, if anything, is left of plaintiffs' due process argument at this stage of the case. At the time it was first presented to the Court of Federal Claims, and ruled on by that court in 1991 (*NLHA II*), the plaintiffs had going for them the decision by the Ninth Circuit in *Rainier View*. Furthermore, they had two district court decisions holding unconstitutional as a violation of the property owners due process rights Congress' attempt in the 1989 amendment to Section 8 to authorize such comparability studies.[9] In 1992, the Ninth Circuit reaffirmed its holding regarding the unavail-

9. *Acacia Villa v. Kemp,* 774 F.Supp. 1240, 1251 (C.D.Ca.1990); *Alpine Ridge Group v. Kemp,* 764 F.Supp. 1393, 1403 (W.D.Wash.1990).

ability under the contracts of comparability studies for rent adjustments and affirmed the district court's holdings that the 1989 amendment to the HUD Act was a violation of the property owners' due process rights. *Alpine Ridge Group v. Kemp,* 955 F.2d 1382 (9th Cir.1992).

The Supreme Court, on certiorari in *Alpine Ridge Group v. Kemp,* 955 F.2d 1382 (9th Cir.1992), took a quite different view. *Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). The Court read the Overall Limitation provision of the contract, subsection 1.8d, set out above,[10] to require expressly that contract rents not be adjusted so as to exceed materially the rents charged for comparable unassisted units on the private rental market, "even if other provisions of the contracts might seem to require such a result." *Id.* at 18–19, 113 S.Ct. at 1903. As a consequence, the Court found no fault with HUD's use of comparability studies as a check against and corrective for the AAAF-driven adjustments. As the Court put it, the Ninth Circuit's reading of these contract provisions was "almost precisely backwards." *Id.* at 19; 113 S.Ct. at 1903.

In *Alpine Ridge* the Court addressed plaintiffs' argument that they were deprived of their due process rights by saying, "[w]e begin our analysis of respondents' due process claim with the assistance contracts. Because we find that those contracts do not prohibit the use of comparability studies to impose an independent cap on the formula-based rent adjustments, our analysis ends there as well." *Id.* at 17, 113 S.Ct. at 1902–03. The trial judge in the case before us was prescient in earlier ruling that, contrary to the Ninth Circuit's view, the contracts did authorize the comparability studies, and thus their use was not a denial of these plaintiffs due process rights. Given the Supreme Court's view of plaintiffs' due process argument, there seems little more to be said, beyond stating our agreement with the trial court's conclusion on this issue. Our sister circuits who have considered this issue since

*Alpine Ridge* agree. *See Federal Housing Partners IV v. Cisneros,* 55 F.3d 362, 368 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 474, 133 L.Ed.2d 403 (1995); *Sheridan Square Partnership v. United States,* 66 F.3d 1105 (10th Cir.1995).

At bottom, plaintiffs complaint here, as it was in *Alpine Ridge,* appears to be a complaint about the quality and technical soundness of the individual comparability studies used as the basis for particular rent caps. The effort to impose a generally applicable constitutional bar against such studies must fail, since the contracts specifically authorize them. That is not to say that plaintiffs are wholly at the mercy of arbitrary government action. As the Supreme Court noted in the *Alpine Ridge* case, "[I]f respondents have been denied formula-based rent increases based on shoddy comparisons, their remedy is to challenge the particular study, not to deny HUD's authority to make comparisons." *Id.* at 20–21, 113 S.Ct. at 1904. This litigation involves no such particularized challenge.

### (2) The APA and FOIA

 Appellants contend that HUD is also required to comply with the rulemaking procedures set forth in the Administrative Procedure Act, 5 U.S.C. §§ 551 and 553, and the disclosure requirements of the Freedom of Information Act, 5 U.S.C. § 552, in conducting their comparability studies. According to appellants, failure to do so rendered these studies "null and void." Appellants suggest that they are not suing for violation of these statutes as such, which they cannot given the forum. They also do not contend that HUD's failure to comply with these provisions resulted in a breach of contract *per se.* Instead, appellants sue on the breach of contract that occurred when HUD paid less than the AAAF-adjusted rents, in reliance on procedurally defective studies.

To reach appellants' argument requires examining its premises. The first is that the

---

**10.** The Supreme Court referred to this subsection as 1.9d, rather than 1.8d. This is because the contracts actually used place the provision in section 1.9, whereas the illustrative contract be-

fore the Court of Federal Claims had it in section 1.8. To be consistent with the opinions below, we have used the 1.8 reference.

APA and FOIA apply at all to these contracts. Appellants contend that they do based on Section 1.1(g) of the HAP contract, which provides:

> Scope of Contract. This Contract, including exhibits, whether attached or incorporated by reference, comprises the entire agreement between the Owner and HUD with respect to the matters contained in it. Neither party is bound by any representations or agreements of any kind except as contained in this Contract, *any applicable regulations*, and agreements entered into in writing by the parties which are not inconsistent with this Contract.

(Emphasis added.) Appellants seize on the "any applicable regulations" language in this section to conclude that HUD is required to comply with the general requirements contained in 24 C.F.R. §§ 10.1 and 15.11.[11] As explained earlier, the former regulation tracks certain notice and publication requirements of the APA and the latter those of FOIA. In essence, appellants contend that the requirements of these regulations were incorporated by reference into the HAP contract.

The next premise in appellants' argument is that the standards and procedures used by HUD to implement the comparability studies were "substantive rules" under the APA since these standards relate to the "approval or prescription for the future of rates, wages, ... prices, ... or of valuations, costs, or accounting, or practices bearing on any of the foregoing." 5 U.S.C. § 551(4). Therefore, these standards and procedures should have been subjected to the "notice and comment" procedures of the APA. In like manner, they argue that the guidelines used to conduct the comparability studies are subject to the publication provisions of FOIA because they are "substantive rules of general policy or inter-

pretations of general applicability formulated and adopted by the agency...." 5 U.S.C. § 552(a)(1)(D). Thus, even if the APA notice and comment procedures were not applicable, the FOIA requirements do apply under this more liberal definition.

Assuming that these provisions apply, appellants conclude that HUD's failure to comply rendered the resulting studies "null and void." It is not clear on what authority they rest this proposition for a violation of the APA since appellants cite none. For a violation of FOIA, however, they cite to FOIA itself.[12] Since, it is argued, HUD was required to and yet did not comply with the APA and FOIA provisions in conducting the comparability studies, they could not adjust the contract rents based on the results of these invalid studies. Having done so, they breached their contractual duty under the HAP contracts.

Appellants' contend that their remedy for such a breach is the full AAAF adjusted rents "under the two-step mechanism enunciated by *Alpine Ridge*." In addition, appellants rely on an internal HUD memo of Thomas T. Demery, Assistant Secretary for Housing, dated June 30, 1987, as well as Section 142(c)(2)(B) of the Housing and Community Development Act of 1987. Pub.L. No. 100–242, 101 Stat. 1815, 1850 (1988) (codified at 42 U.S.C. § 1437f(c)(2)(C) (1988)). That memo instructs HUD field offices to award the full AAAF adjustment in the event that they have not completed comparability studies within two months after a self-imposed internal deadline. The 1988 amendment similarly requires a full AAAF adjustment if a comparability study is not completed within 60 days from the anniversary date of the HAP contract.

The Government attacks each of the premises in appellants' syllogism. As argued suc-

---

**11.** The emphasized language only appears in the post-August 1980 HAP contracts. Prior HAP contracts did not include this language. Although appellants argued below that HUD was required to comply with the APA and FOIA even in the pre-August 1980 contracts, in relying exclusively on this language here they appear to have abandoned the pre-August 1980 contracts. Given our view of the applicability of the regulations to the post–1980 contracts, it is unneces-

sary for us to address the question of the pre-1980 contracts.

**12.** "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a)(1); *see also* 24 C.F.R. § 15.11.

cessfully below, the Government contends that the provision in the HAP contracts was never intended to, and does not, obligate HUD to comply with either the APA or FOIA. Second, they strenuously object to the characterization of their internal memoranda or procedures as meeting the test of a "substantive rule" or "general policy statement" that would bring these documents within the purview of those statutes. Further, should this court reach the issue, argues the Government, the question should be remanded to permit the lower court to consider fully the legal effect of these documents since the lower court did not reach this issue. In response, appellants argue that this is purely a legal question that we are free to decide on the record before us.

As previously stated, the trial court ruled in *NLHA IV*, 32 Fed. Cl. at 767, that the "any applicable regulations" clause in the post-August 1980 version of the HAP contract does not incorporate Sections 10.1 and 15.11 of HUD's general regulations. The court based its conclusion on the "four corners of the contract document." The HAP contract was made generic in nature to cover several different types of Section 8 programs. Each program corresponded to a different part of the HUD regulations. Each of these parts included a host of regulations governing the particular type of program. In particular there were three applicable parts listed on the HAP contract: "Part 880"—"Section 8 Housing Assistance Payments Program for New Construction," 24 C.F.R. pt. 880; "Part 881"—"Section 8 Housing Assistance Payments Program for Substantial Rehabilitation," 24 C.F.R. pt. 881; or "Part 883"—"Section 8 Housing Assistance Payments Program—State Housing Agencies," 24 C.F.R. pt. 883. *See NLHA IV*, 32 Fed. Cl. at 764. The contracting parties would then check a box next to one of these

parts to indicate which type of Section 8 program was involved. The trial court concluded that the "any applicable regulations" language was meant to incorporate the regulations included within the selected "Part," but not the general APA or FOIA regulations.

We have examined the contracts and find them as described by the trial court. The court's plain meaning approach makes eminently good sense. We note further that there has been a long-running debate in the administrative law community over exactly what type of government documents and decisional events fall within the requirements of notice-and-comment rulemaking under the APA and its counter-parts in FOIA.[13] It seems unlikely that HUD would have intended to incorporate into these contracts all its general regulatory provisions without limitation, particularly at a time before the internal procedures and practices at issue were considered necessary. Moreover, we conclude that even if these statutes applied, appellants would not be entitled to the full AAAF-adjusted rent for there is no such presumptive "two-step mechanism" found in *Alpine Ridge*. *See Federal Housing Partners IV*, 55 F.3d at 368 ("We do not see how a failure to follow APA procedures could have given rise to a property right to AAAF's unqualified by comparable local rents, a result necessarily contrary to the contracts, the statute, and [*Alpine Ridge*]."). Having found no error in the trial court's interpretation of the contracts, it is affirmed.

### (3) Reduction in Existing Rents

■ Appellants contend that HUD breached the HAP contract by using comparability studies to reduce pre-existing rents as opposed to limiting future annual adjustments. They argue that both the statute and the contract refer to limiting the "adjustments"

---

**13.** Courts and commentators alike have struggled to define the reach of the APA, describing the line separating those documents covered by the APA and those that are not as "fuzzy," "blurred," "enshrouded by smog," and "baffling." *See Community Nutrition Institute v. Young*, 818 F.2d 943 (D.C.Cir.1987) (per curiam) (*citing Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C.Cir.1974)); Kevin W. Saunders, *Interpretative Rules With Legislative Effect: An* *Analysis and a Proposal for Public Participation*, 1986 Duke L.J. 346, 352; *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir.1975); respectively; *see also* Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 Duke L.J. 1311, 1321 (1992); 2 K. Davis, *Administrative Law Treatise* 32 (2d ed.1979).

**1434**

and not the contract rents. Appellants admit, as they must under *Alpine Ridge,* that HUD has the power to adjust contract rents to ensure that they do not materially exceed the rent for comparable unassisted units, but appellants argue that that power applies only to reductions in the current annual adjustment dictated by the AAAFs.

Appellants argue that modifying the AAAF is the exclusive means to reduce the rents below the previous year's contract rent, i.e., a negative AAAF. This argument was considered and rejected by the Supreme Court. The Supreme Court well understood the purpose of the HUD's use of the comparability studies in referring to them as "an *independent cap* limiting the *rent payments* HUD would make under the Section 8 contracts." *Alpine Ridge,* 508 U.S. at 14, 113 S.Ct. at 1901 (emphasis added). The Court thus made clear that the comparability studies are a mechanism to ensure that the rents paid do not exceed the fair market value, i.e., a "cap." This mechanism is "independent" of the AAAFs. Moreover, it limits the "rent payments" and not merely the "adjustments" as argued by the Appellants.

In *Alpine Ridge,* the Court considered the *Rainier View* court's view that 24 C.F.R. § 888.204, which states that the agency "will consider establishing separate or revised [AAAFs] for [a] particular area," barred adjustments to contract rents independent of the published factors. Although the Court acknowledged that the regulation was consistent with this view, it concluded that while the contract allows for "adjustment factors as a means of remedying material differences in rents ... it does not foreclose corrective adjustments *independent* of the factors." *Alpine Ridge,* 508 U.S. at 20 n. 2, 113 S.Ct. at 1904 n. 2 (emphasis added). We conclude, as did the Supreme Court, that the HAP contracts permit HUD to reduce rents below a previous year's rent by the use of comparability studies.

This conclusion is supported by common sense as well as precedent. The AAAFs are designed to provide for uniform adjustment of rents throughout a relatively large geographical area, much in the same way that cost of living allowances ("COLAs") adjust wages. The annual adjustments, however, are not designed to correct past inaccuracies in the rent. Instead they are designed to reflect the escalation in prices over the preceding year as measured by the Consumer Price Index and other generalized indicia. To prevent HUD from adjusting rents downward by the use of comparability studies, thus limiting the role of comparability studies to constraining only future increases in rents, would be to allow a property owner to maintain an elevated rent level in contravention of the statute and the contract.

The point can be illustrated by the following example. Suppose that HUD assigns an initial contract rent of $500 to Owner. The next year the AAAF is 5%. Accordingly HUD increases the contract rent to $525. Assume that the following year, because of a general downturn in the economy in the general geographic area that the AAAF encompasses, the AAAF is set at 1%. However, HUD conducts a comparability study regarding Owner's property and discovers that the rent for comparable unassisted housing is only $485 due to more depressed conditions in the more limited area surrounding the property. Appellants acknowledge that Owner may not be entitled to the 1% increase for that year, but under appellants' view of the contracts, he would be entitled to continue to claim rent payments of $525. This cannot be a correct result, however, since there is a material difference between the contract rent and that for comparable unassisted units.[14] We conclude that this is contrary to the statute and the contract and we therefore reject appellants' interpretation. Accordingly, we affirm the lower court's ruling.

### (4) Initial Difference: Fixed Dollars v. Percentage

■ Appellants contend that HUD breached the HAP contracts by paying only a fixed dollar amount versus a fixed percentage in order to maintain the "initial difference" between the contract rent and the rent of com-

---

**14.** We assume for sake of illustration that there is no "initial difference" between the initial contract rent and the rent of a comparable unassisted unit.

parable units. Subsection 1.8(d) of the HAP contract provides that the "[overall] limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents." Appellants argue that this provision requires HUD to maintain the same *percentage* difference between the adjusted contract rent and the corresponding rent produced by the comparability study as existed between the initial contract rent and the rent of a comparable unassisted unit at the time of the contract. The Government contends that this initial difference should simply be the mathematical difference, expressed in dollars, between the original contract rent and the initial rental value of a comparable unassisted unit. Thus, if the original contract rent was $500 and the rent of a comparable unassisted unit was $400, HUD is required to maintain a $100 difference between the adjusted rent and the rent of a comparable unassisted unit, as determined by the comparability study. Appellants' approach would require HUD to maintain a 25% difference between the two.

The trial court interpreted this proviso to require that the mathematical difference between the two, as expressed in dollars, be maintained in subsequent years. The court considered and rejected appellants' argument that HUD's conduct in calculating the original contract rent evinced an intent to adopt appellants' interpretation. *NLHA III*, 32 Fed. Cl. at 469–70.

It should first be noted that in this context a "difference" is defined as a result of the subtraction of two numbers, which by necessity has the same units as the two numbers. *Webster's Third New International Dictionary* 628 (1986) ("the result obtained by subtracting one magnitude, number, or function from another of the same kind"). In this case the relevant units are dollars. Thus, the initial difference between the initial contract price and the rent of a comparable unassisted unit produces a number expressed in dollars. This is the plain meaning of this term. *See Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed.Cir.1992) ("Wherever possible, words of a contract should be given

their ordinary and common meaning.") (citation omitted).

Appellants' reading would require that the initial result (expressed in dollars) be divided by another number to produce an initial percentage difference. To apply this initial percentage difference in subsequent years, the adjusted contract rent would have to be multiplied by this initial percentage difference and the result of this calculation added to the adjusted contract rent. This injects unnecessary complexity into the contract.

Appellants' position is also contrary to the purpose of this provision. This provision permits the property owners to be compensated for the additional costs of complying with and participating in the Section 8 program. Most of these costs, such as debt service and special amenities, are fixed at the time of the contract. A fixed dollar initial difference would thus compensate the owners for these additional costs. Allowing the initial difference to escalate over time, in some instances at least, would produce a windfall for the landlord. The fact that appellants can cite to some variable costs of operating a property under the Section 8 program does not change this fact. We conclude that the trial court was correct in its understanding of how this proviso should be interpreted; accordingly, we affirm the trial court's ruling.

### (5) Privity of Contract

■ The last issue to be addressed is whether the Court of Federal Claims had jurisdiction over those owners who entered into HAP contracts with the PHAs rather than with HUD directly. The Court of Federal Claims concluded that it did not.

Appellants put forward two bases to establish privity of contract with the United States, an undisputed prerequisite for standing to sue in the Court of Federal Claims under the Tucker Act. The first is that the PHAs acted as "agents" for the United States. Appellants cite *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed. Cir.1983) in support of their position. In describing the rare circumstances under which a subcontractor can sue the Government directly, the court in *Johnson Controls* identified three factors that must be present

in order for the subcontractor to establish privity of contract:

> The prime contractor was (1) acting as a purchasing agent for the government; (2) the agency relationship between the government and the prime contractor was established by clear contractual consent; and (3) the contract stated that the government would be directly liable to the vendors for the purchase price.

*Id.* at 1551 (citations omitted). The court below held that "[n]one of these factors is present in this case." *Id.*

Appellants argue that, unlike the subcontractor in *Johnson Controls,* they can shoulder the heavy burden of satisfying all three requirements. Even assuming that appellants could satisfy the first two factors, they cannot meet the third. Appellants rely on § 2.16(a) of the PHA's Annual Contribution Contracts ("ACCs") with HUD to prove HUD's direct liability. These are the contracts between HUD and the various PHAs, under which the PHAs administer their contracts with those landlords who contract with the PHAs to provide Section 8 housing. The cited section of the ACC states that "HUD. shall assume the [PHA's] rights and obligations under the [ACC] and/or [HAP] Contract...." What appellants fail to recite, however, is the rest of this provision, which requires HUD to assume these rights and obligations "in accordance with paragraph (b)(3) [of the ACC]." That paragraph in turn provides that "HUD *may,* if it determines the [PHA] is in default, assume the [PHA's] rights and obligations...." (Emphasis Added.) Thus, HUD's liability, if any, is completely within its discretion.

This is not the type of direct, unavoidable contractual liability necessary to trigger a waiver of sovereign immunity, the inevitable result of finding privity of contract. In both the cases on which the *Johnson Controls* court relied for these three requirements, the Government liability was not contingent, nor within its discretion. In *Kern–Limerick, Inc. v. Scurlock,* 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954), the Navy entered into a cost-plus contract that obligated them to pay the costs incurred by the contractor. The contract between the Navy and the contractor required that "the Government *shall* be liable to the vendors for the purchase price." *Id.* at 112, 74 S.Ct. at 405 (emphasis added). Similarly, in *Western Union Telegraph Co. v. United States,* 66 Ct.Cl. 38, 1928 WL 3062 (1928), the United States could not avoid liability. There was no question that the Government was liable. *Id.* 66 Ct.Cl. at 50 ("[t]he defendant [United States] admits it is liable"). The only question was the amount of liability. *Id.* at 49.

In the case before us, the liability of the United States, if any, is contingent upon their acquiescence. This is not the direct, uncontested liability that is required to fit within this narrow exception to the general rule that the Court of Federal Claims does not have jurisdiction over sub-contractor's claims against the United States. The only authority from this court on point supports our conclusion. In *Katz v. Cisneros,* 16 F.3d 1204 (Fed.Cir.1994), a property owner who had entered into a HAP contract with a PHA sued HUD in the United States district court of Massachusetts for, *inter alia,* breach of contract. The district court transferred the contract claim to the Court of Federal Claims. The property owner filed an interlocutory appeal with this court. The *Katz* court reversed and remanded, concluding that the Court of Federal Claims did not have jurisdiction because, *inter alia,* the property owner did not have a contract with the United States, the *"sine qua non* of jurisdiction in the Court of Federal Claims." *Id.* at 1210.

*Katz* also controls over appellants' alternative theory of privity—third party beneficiary. Appellants argue that even if they are not in privity with the United States through an agency relationship, they nonetheless have privity as third party beneficiaries of the ACCs between the United States and the PHAs. The trial court concluded that the third party beneficiaries of the ACCs are the tenants and not the property owners. The *Katz* court agreed—"If there is a third party beneficiary at all, it is probably the low-income tenants," *id.,* as do we. Appellants cite no cases in which property owners have been held to be third party beneficiaries of

the ACCs. The only cases cited by the Appellants bolster our conclusion that they are not.[15] The trial court correctly ruled that those plaintiffs who contracted with PHAs and not directly with HUD did not have contracts that gave them the right to sue the United States for breach.

In summary, it must be remembered that this is a breach of contract dispute. Otherwise the Court of Federal Claims, and therefore this court, would not have jurisdiction. We do not condone poor administration of federally regulated programs. We do, however, require proof of breach in order to hold in favor of an aggrieved litigant in a contract action. The Supreme Court's concluding comments in *Alpine Ridge* apply with equal force to this case:

> At bottom, many of respondent's arguments in support of the decision below seem to circle back to their vigorous contention that HUD's comparability studies have been poorly conceived and executed, resulting in faulty or misleading comparisons. But the integrity with which the agency has carried out its comparability studies is an entirely separate matter from its contractual authority to employ such studies at all. Even if it could be demonstrated that HUD's studies have been unreliable, this would in no way suggest that the contract forbids HUD from capping rents based on accurate and fair comparability studies. If respondents have been denied formula-based rent increases based on shoddy comparisons, their remedy is to challenge the particular study, not to deny HUD's authority to make comparisons.

*Alpine Ridge,* 508 U.S. at 20–21, 113 S.Ct. at 1904.

## CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims is

*AFFIRMED.*

Each party to bear its own costs.

---

**15.** *Henry Horner Mothers Guild v. Chicago Housing Auth.,* 824 F.Supp. 808 (N.D.Ill.1993) (tenants third party beneficiaries); *accord Gomez v. Housing Auth. of City of El Paso,* 805 F.Supp. 1363 (W.D.Tex.1992), *aff'd* 20 F.3d 1169 (5th Cir.1994) (table); *Hurt v. Philadelphia Housing Auth.,* 806 F.Supp. 515 (E.D.Pa.1992); *Guild v. Chicago Housing Auth.,* 780 F.Supp. 511 (N.D.Ill. 1991); *Tinsley v. Kemp,* 750 F.Supp. 1001 (W.D.Mo.1990); and *Concerned Tenants of Father Panik Village v. Pierce,* 685 F.Supp. 316 (D.Conn.1988).