NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**WOLF CREEK RAILROAD LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2024-1873

_____

Appeal from the United States Court of Federal Claims in No. 1:23-cv-01684-CNL, Judge Carolyn N. Lerner.

_____

Decided:  November 25, 2025

_____

LEWIS P. RHODES, Reston Law Group LLP, Reston, VA, argued for plaintiff-appellant.  Also represented by THOMAS DAVID.

SEAN KELLY GRIFFIN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by BRIAN M. BOYNTON, ERIC P. BRUSKIN, PATRICIA M. MCCARTHY.

_____

Before DYK, TARANTO, and CHEN, *Circuit Judges*.

TARANTO, *Circuit Judge*.

In 2023, Wolf Creek Railroad LLC sued the United States Army Joint Munitions Command (the Army) in the United States Court of Federal Claims (Claims Court) for compensation for alleged breach of a contract with the Army, including breach of an implied covenant of good faith and fair dealing. Wolf Creek brought its action under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101(7), 7104(b)(1), invoking the Claims Court's jurisdiction under 28 U.S.C. § 1491(a)(1)–(2). As relevant here, the Claims Court dismissed the complaint for lack of subject matter jurisdiction because the Army contract alleged was not one to which Wolf Creek was a party or under which the Army owed Wolf Creek a contractual duty. *Wolf Creek Railroad, LLC v. United States*, No. 23-1684, 2024 WL 1270189 (Fed. Cl. Mar. 26, 2024) (*CFC Decision*). We affirm.

I

A

In 2008, the Army executed Contract No. W52P1J-09-E-0001 (Facility Contract) with American Ordnance, LLC, effective October 2, 2008, whereby American Ordnance agreed to perform operations and maintenance services at the Milan Army Ammunition Plant (Plant) in Milan, Tennessee. J.A. 40, 49. The Army and American Ordnance also executed Contract No. W52P1J-09-G-0001 (Basic Ordering Agreement), effective the same day, providing for the Army to obtain operation and maintenance services from American Ordnance beyond those explicitly identified in the Facility Contract. J.A. 219–303. Within the Basic Ordering Agreement was a statement of work, in furtherance of the Armament Retooling and Manufacturing Support (ARMS) Initiative, stating that the Army could authorize American Ordnance to put Army facilities to

commercial use by, among other things, entering into "tenant use agreements" with third parties.  J.A. 233.

The statement of work (SOW) provided:

> The Government may authorize the Contractor [*i.e.*, American Ordnance] to use facilities in support of . . . tenant use agreements under this facility contract during the term hereof. . . . Approval for such use shall not be construed as an extension of the facility contract.  The approval for each use shall stand as separate agreements entered into under the authority of the facility contract, allowing use of those facilities specifically identified in the agreement for the specified period.  Execution of each use and/or extension/option is dependent upon receipt of written authorization from the [Facility Contract] Contracting Officer.

J.A. 233 (SOW § 2.1.1).  The SOW also clarified that, when American Ordnance entered into a tenant use agreement with the Army's authorization,

> [t]he [Army] is not a party to the Tenant Use Agreements and does not deal directly with the tenants; all consideration/revenue is considered due from [American Ordnance].

J.A. 235 (SOW § 3.3.7).  And the SOW addressed termination and ensuing settlement costs:

> The FAR [(Federal Acquisition Regulation)] Part . . . 49 . . . sets forth the terms for establishing appropriate termination settlement costs associated with any . . . tenant use agreements. . . . Settlement consideration costs must be found allowable, allocable, and reasonable in accordance with the FAR requirements.  Settlement consideration will include the contractors/subcontractors/tenant use contractor's financial investment and contractual commitment for each individual . . . tenant use

> agreement impacted. Tenant use contractors will negotiate all settlement agreements with [American Ordnance].

J.A. 234 (SOW § 2.2.4).

A decade later, in April 2018, American Ordnance requested authorization from the Army's contracting officer to "subcontract" with Wolf Creek for Wolf Creek to operate a railway system at the Plant. J.A. 304–05. Two months later, the contracting officer issued a memorandum approving the request if certain conditions were met. J.A. 306–09. As relevant here, the Army (1) required the agreement between American Ordnance and Wolf Creek to be a tenant use agreement in accordance with the SOW; (2) required a copy of the executed agreement to be sent to the Army; (3) reserved the right to cancel an approved use at no cost to itself if the Plant was closed, sold, and/or transferred to an entity outside the Department of the Army; and (4) required the agreement to stipulate that the Army "shall not be held liable in the event that [Wolf Creek] is forced to cease operations and thereby vacate the facility as a result of any change in [the Plant's] status." J.A. 306–08. The Army's authorization letter further explained that "[i]ndemnification is not included as part of this approval." J.A. 308.

In June 2018, American Ordnance and Wolf Creek executed Tenant Use Contract AO 18-0002 (2018 TUA), which had a twenty-five-year duration with potential for renewal. J.A. 310–338. The Army did not review the 2018 TUA before it was executed by American Ordnance and Wolf Creek. *See* Complaint, *Wolf Creek Railroad LLC v. United States*, No. 24-1873 (Fed. Cl. Sept. 29, 2023), ECF No. 1 ¶ 15 (Complaint). In the 2018 TUA, Wolf Creek agreed to perform tasks such as railcar maintenance and repair, including maintenance of and certain repairs for government-owned locomotives, among other operational duties. J.A. 313–15. American Ordnance charged Wolf

Creek fixed monthly fees for its use of the Plant and collected a percentage of Wolf Creek's revenue from its operations at the Plant. J.A. 304, 314. The 2018 TUA also addressed termination procedures, using the word "Owner" to refer to the landowner, *i.e.*, the Army:

> (a) Convenience – The Owner's representative [*i.e.*, American Ordnance] may terminate this Agreement or portions thereof at any time by giving thirty (30) days written notice to the Tenant [*i.e.*, Wolf Creek] . . . (iii) in the event the Government determines that termination of this Agreement or portions thereof is in the best interests of the Government or (iv) the Owner's representative's inability to perform any of its obligations, including, but not limited, its ability to authorize use of the Facilities to the Tenant. In the event of termination under this provision, the termination will be at no cost to the Owner's representative and the Owner's representative shall be held harmless for any damages as a result of the termination. . . .

> (d) This Article 13 shall be administered according to FAR Part 49, as it relates to fixed price contracts.

J.A. 323 (2018 TUA §§ 13(a), (d)).

In 2019, Mr. Patrick Lootens, who was then the contracting officer on the Army-American Ordnance contracts, sent a letter to American Ordnance ordering cessation of "ARMS marketing efforts . . . [that] facilitate the introduction of new tenants at [the Plant]." J.A 424. Nearly two years later, Mr. David DeAnda, who had replaced Mr. Lootens as the contracting officer, rescinded authorization for all of American Ordnance's tenant use agreements because the Plant was to be sold. J.A. 365, 426. The Army ordered all tenants to exit the Plant by December 31, 2021. *Id.* American Ordnance then terminated the 2018 TUA with Wolf Creek. Complaint, ¶ 27.

B

Wolf Creek made two attempts to submit a claim letter to the contracting officer on the Army-American Ordnance contracts, such a pre-suit claim being required under the CDA, 41 U.S.C. § 7103. Perhaps because Wolf Creek was not a signatory to the contracts with the Army, it seemingly lacked up-to-date information for reaching the actual contracting officer at the time. First, on May 30, 2023, Wolf Creek emailed a claim letter to Mr. Lootens, who no longer was the contracting officer, having retired in 2020. Complaint, ¶¶ 29–33; J.A. 365, 373. Second, on September 5, 2023, Wolf Creek emailed a claim letter to Mr. DeAnda, who also was not the contracting officer, having ceased serving in that role in 2022. Complaint, ¶ 34; J.A. 365. Although Wolf Creek sent the claim letter to Mr. DeAnda's email address that was listed on the rescission letter, Mr. DeAnda did not receive the letter because the Army had migrated email accounts in 2021, and the former email address had been deleted. *CFC Decision*, 2024 WL 1270189 at *4 n.2; J.A. 366.

Mr. Beau Bixler became the contracting officer in March 2022. J.A. 364. Mr. Bixler never received correspondence from Wolf Creek relating to the 2018 TUA. *Id.*

C

On September 29, 2023, Wolf Creek filed suit against the Army in the Claims Court under the CDA, Complaint ¶ 5, alleging breach of contract (specifically the 2018 TUA), specifically of an implied duty of good faith and fair dealing, and seeking contract damages, Complaint, ¶¶ 37–51. In January 2024, the Army moved to dismiss the complaint. A month later, Wolf Creek mailed a third claim letter to the Army Contracting Command.

On March 26, 2024, the Claims Court dismissed Wolf Creek's suit for lack of subject matter jurisdiction, as well as for failure to state a claim upon which relief could be

granted.  *CFC Decision*, 2024 WL 1270189, at \*9.  The Claims Court relied for its decision on some factual development outside the Complaint, as permitted for jurisdictional issues.  *See Reynolds v. Army & Air Force Exchange Services*, 846 F.2d 746, 747 (Fed. Cir. 1988).  On appeal, Wolf Creek does not demonstrate that such reliance was improper.  Nor does Wolf Creek challenge, on appeal, the Claims Court's denial of its request for additional discovery.  *CFC Decision*, 2024 WL 12701879, at \*8–9.

The Claims Court found an absence of jurisdiction for two reasons.  First, it determined that Wolf Creek failed to submit a certified claim to the contracting officer as required by the CDA, which it held to be a jurisdictional prerequisite to filing suit at the Claims Court.  *CFC Decision*, 2024 WL 1270189, at \*3–4.  Second, and independently, the Claims Court determined that none of the contracts at issue, including the 2018 TUA, established privity of contract between Wolf Creek and the Army—and, specifically, that American Ordnance was not the Army's agent in the 2018 TUA.  *Id.* at \*5–7.  In support, the Claims Court explained that Wolf Creek had paid American Ordnance for its use of the Plant, *id.* at \*5–6, the Army lacked meaningful control over American Ordnance's "management of its lessees," *id.* at \*6, and there was no express term in the relevant agreements authorizing American Ordnance to be the Army's purchasing agent, *id.* at \*6–7.

Wolf Creek timely appealed the dismissal.  We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

We review and affirm the Claims Court's conclusion that it lacked jurisdiction under the Tucker Act because Wolf Creek was not in privity with the Army on any contract and, in particular, American Ordinance was not serving as the Army's agent when entering into the 2018 TUA with Wolf Creek.  Our affirmance of that conclusion suffices to affirm the jurisdictional dismissal.  We do not reach the

question of whether Wolf Creek failed to submit a claim within the meaning of the CDA.

In this case, the only jurisdiction invoked is the contract jurisdiction under the Tucker Act, requiring an "express or implied contract with the United States," 28 U.S.C. § 1491(a)(1), which can be a contract under the CDA, *id.* § 1491(a)(2). As applied here, the provision requires plaintiff-government "privity"—a "contract, express or implied in fact, by the government *with* the plaintiff[.]" *Merritt v. United States*, 267 U.S. 338, 341 (1925) (emphasis added). Where there is no privity, the provision does not apply: "[T]he no-privity rule is synonymous with a finding that there is no express or implied contract between the government" and a complainant and, therefore no jurisdiction. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550 (Fed. Cir. 1983); *see also Lumbermens Mutual Casualty Co. v. United States*, 654 F.3d 1305, 1321 (Fed. Cir. 2011); *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1371 (Fed. Cir. 2009); *Admiralty Construction by National American Insurance Co. v. Dalton*, 156 F.3d 1217, 1222 (Fed. Cir. 1998).

We review the Claims Court's jurisdictional ruling de novo. *See, e.g.*, *Biltmore Forest Broadcasting FM, Inc. v. United States*, 555 F.3d 1375, 1380 (Fed. Cir. 2009); *England v. The Swanson Group, Inc.*, 353 F.3d 1375, 1378 (Fed. Cir. 2004). Generally, and here, we also interpret contracts and regulations de novo. *See, e.g.*, *Nova Group/Tutor-Saliba v. United States*, 87 F.4th 1375, 1378–79 (Fed. Cir. 2023); *CGI Federal Inc. v. United States*, 779 F.3d 1346, 1353 (Fed. Cir. 2015). Findings of fact are reviewed for clear error, *Stephens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018); *Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015), and we are not "required to accept a complaint's legal conclusions." *Frankel v. United States*, 842 F.3d 1246, 1249 (Fed. Cir. 2016).

Wolf Creek makes essentially two arguments that it had a contractual relationship with the Army. First, it argues that incorporation of FAR provisions in the SOW and the 2018 TUA imply such a relationship insofar as termination of its 2018 TUA is concerned. Second, it argues that American Ordnance acted as the Army's agent in entering into the 2018 TUA with Wolf Creek. Appellant Opening Br. at 12–18. We reject both arguments.

A

The SOW § 2.2.4, J.A. 234, and the 2018 TUA § 13(d), J.A. 323, both incorporate FAR part 49 by reference. Section 2.2.4 of the SOW—in a contract between the Army and American Ordnance (not Wolf Creek)—provides: "The FAR Part . . . 49 . . . sets forth the terms for establishing appropriate termination settlement costs associated with any . . . tenant use agreements being performed within the [Plant] . . . Tenant use contractors will negotiate all settlement agreements with [American Ordnance]." J.A. 234. Section 13(d) of the 2018 TUA—an agreement between American Ordnance and Wolf Creek—provides: "This Article 13 [concerning termination] shall be administered according to FAR Part 49, as it related to fixed price contracts." J.A. 323. Based on those incorporation provisions, Wolf Creek argues that it is "entitled to pursue a termination claim directly against the Army under the provisions of FAR Part 49" because 2018 TUA § 13(a), absolves Wolf Creek's contract counterparty, American Ordnance, from liability when the Army revokes authorization for use of the Plant, causing a termination of the 2018 TUA. Appellant Opening Br. at 15; *see* J.A. 323.

Those provisions, however, do not soundly imply creation of a new contractual relationship between the Army and Wolf Creek. FAR part 49 itself does not establish a contractual relationship between the Army and a subcontractor/tenant or otherwise provide a mechanism for the

subcontractor/tenant to sue the Army. Indeed, the FAR states:

> A subcontractor has *no* contractual rights against the [g]overnment upon the termination of a prime contract. A subcontractor *may* have rights against the prime contractor or intermediate subcontractor with whom it has contracted. Upon termination of a prime contract, the prime contractor and each subcontractor are responsible for the prompt settlement of the settlement proposals of their immediate subcontractors.

48 C.F.R. § 49.108-1 (emphases added).

Wolf Creek identifies no language in the 2018 TUA that expressly or implicitly creates a contractual relationship with the Army. In particular, no such creation can be inferred from the fact that American Ordnance is "held harmless" in the event of a termination following the Army's withdrawal of authorization. 2018 TUA § 13(a). That provision, relieving American Ordnance of liability, does not impose contract liability on the Army.

### B

Wolf Creek's second argument that it had a contractual relationship with the Army is that American Ordnance was acting as an agent for the Army in entering into the 2018 TUA with Wolf Creek. Appellant Opening Br. at 15–18. We apply the test established in *Johnson Controls* to evaluate whether American Ordnance acted as the Army's agent and, thus, possessed the authority to waive the Army's sovereign immunity and establish a contractual relationship between Wolf Creek and the Army. *Johnson Controls*, 713 F.2d at 1551. To prevail under this test, Wolf Creek must carry a "heavy burden": The agency-relationship is a "narrow exception to the general rule that the [Claims Court] does not have jurisdiction over sub-contractor's claims against the United States." *National Leased*

*Housing Association v. United States*, 105 F.3d 1423, 1436 (Fed. Cir. 1997). Under the standards articulated for assessing a subcontractor's assertion that a prime contractor was the owner's (government's) agent, each of the following crucial factors must be proved—that the prime contractor was "acting as a purchasing agent for the government," "the agency relationship between the government and the prime contractor was established by clear contractual consent," and "the contract stated that the government would be directly liable to the vendors for the purchase price." *Id.* (quoting from *Johnson Controls*, 713 F.2d at 1551). The Claims Court properly held that Wolf Creek failed to establish the asserted agency relationship.

As an initial matter, we note, without relying on the point, that we see no reversible error in the Claims Court's determination that Wolf Creek has not established that American Ordnance acted as a "purchasing agent" for the Army in the 2018 TUA. *CFC Decision*, 2024 WL 1270189, at *5–6. To be sure, the 2018 TUA stated that American Ordnance was acting as "('Owner's Representative') for the U.S. Army Joint Munitions Command." J.A. 312. But American Ordnance had no authority to act on behalf of the Army, and as discussed above, the agreement between American Ordnance and the Army explicitly denied such authority. Wolf Creek also relies on American Ordnance's Request for Use letter, which indicates that Wolf Creek would "assume maintenance of the [Army] owned locomotives." Appellant Opening Br. at 16–17 (citing J.A. 304). But it is undisputed that "[t]here [was] no 'purchase price' in the [2018] TUA," and Wolf Creek does not identify any language in the 2018 TUA (or other contracts at issue) that demonstrates American Ordnance was even *purchasing* from Wolf Creek, much less for the Army. Appellant Opening Br. at 16–18. The record indicates that Wolf Creek was paying American Ordnance—to use the Plant to generate revenue for itself. J.A. 304, 314. Wolf Creek's obligation to provide maintenance and limited repair services for the

Army's locomotives might suggest that the Army was a third-party beneficiary of the 2018 TUA established by and between Wolf Creek and American Ordnance, J.A. 313–15; *see Lumbermens*, 654 F.3d at 1311–12, but that is not the same as American Ordnance purchasing from Wolf Creek for the Army.

In any event, and decisively, as the Claims Court determined, *CFC Decision*, 2024 WL 1270189, at *6–7, Wolf Creek has not shown that an "agency relationship between the government and [American Ordnance] was established by clear contractual consent" *or* that the Army agreed to be held "directly liable to [Wolf Creek] for the [termination costs]." *Johnson Controls*, 713 F.2d at 1551. Wolf Creek argues otherwise because the SOW requires American Ordnance to receive the Army's authorization before entering into a tenant use agreement. Appellant Opening Br. at 17–18; J.A. 233 (SOW § 2.1.1). But more is needed to establish an agency relationship, and not enough else is present. *Johnson Controls*, 713 F.2d at 1552.

In *Pacific Gas & Electric Co. v. United States*, we explained that we examine the relevant contract's provisions to determine whether (1) the principal (here, the Army) manifested consent for another entity (here, American Ordnance) to act on the principal's behalf and subject to its control, and (2) the entity agreed to do so. 838 F.3d 1341, 1359 (Fed. Cir. 2016) (citing Restatement (Third) of Agency § 1.01). The Supreme Court concluded in *Kern-Limerick v. Scurlock* that an agency relationship existed when the Navy entered into a cost-plus contract that explicitly provided that the "[g]overnment shall be obligated to the Vendor for the purchase price." 347 U.S. 110, 119–21 (1954). No such language is present in the relevant contracts here.

While the SOW reflects mutual assent for American Ordnance to execute tenant use agreements contingent on the Army's authorization, J.A. 233 (SOW § 2.1.1), Wolf Creek cannot prove that the Army consented to the "direct,

unavoidable contractual liability necessary to trigger a waiver of sovereign immunity." *National Leased Housing Association*, 105 F.3d at 1436. The Army explicitly memorialized in the SOW § 3.3.7 that it "is not a party to the [t]enant [u]se [a]greements and does not deal directly with the tenants" and that "all consideration/revenue is considered due from [American Ordnance]." J.A. 235. The Army further stated that "[i]ndemnification is not included as part of [its] approval" of American Ordnance's request to contract with Wolf Creek. J.A. 308. And the Army also stated in the SOW that its "[a]pproval for [ ] use [of the Plant by third parties] shall not be construed as an extension of the facility contract[.]" J.A. 233 (SOW § 2.1.1).

We have recognized that the government is permitted to "retain[ ] a great deal of control over the actions of" a contractor while not transforming the contractor into an agent. *Johnson Controls*, 713 F.2d at 1552. Here, the various contract provisions, far from meeting the standard for finding an agency relationship, point against such a finding under the applicable strict legal standards. The Claims Court, which was not obligated to take as true the legal conclusions alleged in the complaint, *Frankel*, 842 F.3d at 1249, properly held there to be no agency relationship.

## III

We have considered Wolf Creek's remaining arguments and find them unpersuasive. We therefore affirm the Claims Court's ruling that it lacked jurisdiction in this case and its dismissal of Wolf Creek's case.

**AFFIRMED**