Joanne KNIGHT, et al., Plaintiffs,

v.

**THE UNITED STATES, Defendant.**

No. 99–990 C.

United States Court of Federal Claims.

April 5, 2002.

Jeffrey D. Servin, Philadelphia, Pennsylvania, for plaintiffs.

Monica J. Palko, Washington, D.C., with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Todd M. Hughes, Assistant Director, for defendant.

## OPINION

BUSH, Judge.

In this action, plaintiffs seek breach of contract damages in connection with their work as employees of the Little Neighborhood Center, Inc. (LNC), service provider for the government's Head Start program. This action is before the court on defendant's motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(4) of the Rules of the Court of Federal Claims (RCFC). Defendant contends that this court lacks jurisdiction to entertain plaintiffs' claim since plaintiffs' complaint demonstrates that a contract did not exist between plaintiffs and defendant. In the alternative, defendant asserts that because there is no contract between plaintiffs and defendant, plaintiffs fail to state a claim for which relief can be granted. For the reasons set forth below, this court concludes that there is not an express or implied-in-fact contract between plaintiffs and the government; thus, plaintiffs' claim does not fall within the scope of this court's Tucker Act jurisdiction and defendant's motion to dismiss is granted.

## BACKGROUND

In 1967, the Department of Health and Human Services (DHHS), Administration for Children and Families (ACF) awarded grant number 03CH2487 to LNC to fund a Head Start program which LNC would operate in northern Philadelphia. The Head Start program's purpose is to "promote school readiness by enhancing the social and cognitive development of low-income children...." 42 U.S.C. § 9831 (1998). Hence, LNC, under the grant, would provide educational, nutritional, and social services to preschool children of low-income families in the Philadelphia area. *Id.* The initial grant was also a "non-competing continuation" grant issued for an indefinite period. Consequently, DHHS refunded the grant on a yearly basis, without competition.

From late 1997 through early 1998, various concerns arose regarding LNC's Head Start program. On March 23, 1998, DHHS and LNC held a meeting during which DHHS requested that LNC voluntarily relinquish its

grant. On March 25, 1998, David J. Lett, Regional Administrator for DHHS, sent a letter to Reverend Patrick C. Elmore (Dr. Elmore), President of the Board of Directors for LNC, confirming the discussions during which Mr. Lett asked LNC to voluntarily relinquish its grant. In this letter, Mr. Lett stated that he wanted "to reaffirm the options and commitments [they] discussed and to specify the last day for the Board's decision on relinquishment . . . ." Compl. Exh. A; Def.App. at 9. In assuring Dr. Elmore that his commitment to Head Start in northern Philadelphia would not be diminished, Mr. Lett stated that "[i]f LNC agrees to relinquish the program, services for children and employment for staff will continue without interruption." *Id.* Mr. Lett also acknowledged that the LNC Board had expressed the wish to submit a plan to substantially improve LNC's operation and management of the Head Start program, if LNC decided not to relinquish its grant. In addition, Mr. Lett gave a brief overview of the "relinquishment options" DHHS and LNC had previously discussed. To this end, Mr. Lett's letter states:

> If the Board agrees to relinquish the program, services will be maintained to the end of the current grant year with no break in service between now and then. . . . To assure that the program reopens in September, as usual, we will select another Head Start agency to operate the program on an interim basis. Under these arrangements, LNC staff and component coordinators would be hired to provide the program through mid-June 1999 and children would receive the full Head Start program.

Compl. at ¶ 20 and Exh. A at 2; Def.App. at 10. Additionally, the letter states that if LNC did not agree to relinquish its Head Start program, Mr. Lett would deny refunding pursuant to 45 C.F.R. Part 1303.15.

In April 1998, LNC submitted to DHHS a plan to improve its Head Start program. On April 17, 1998, Mr. Lett sent a letter to LNC via Dr. Elmore stating that LNC's plan was unsatisfactory and reiterating ACF's request that LNC voluntarily relinquish its Head Start grant. As in his March 25, 1998 letter, Mr. Lett again expressed his commitment to the Head Start program, stating that the agency would work with the LNC Board and staff to "ensure continued services to children and families in the LNC service area if the Board decides to relinquish the grant" and that his commitment to maintain "service to children and families and continuity of employment for LNC staff" remained. Compl. Exh. B at 2; Def.App. at 12.

On or about May 22, 1998, Mr. Lett and the LNC Board of Directors held a meeting during which Mr. Lett repeated his statement from the March 25, 1998 letter that LNC staff would be rehired. The LNC Board of Directors, Policy Council, and LNC staff, including most of the plaintiffs, attended this meeting.

In an agreement signed by representatives of LNC and ACF on June 16, 1998 (hereinafter "Agreement"), LNC voluntarily relinquished its grant for the Head Start program, effective May 31, 1998. ACF also warranted that the interim grantee agreed "to offer employment to qualified LNC staff, excluding the Executive Director and administrative management personnel, through mid-June 1999." Pl. Res. at Exh. C, ¶ 6. In addition, the parties resolved that the Agreement represented the entire agreement between the parties and superseded any and all prior understandings or agreements between the parties related to the subject matter of the Agreement. Finally, with regard to confidentiality, the Agreement stated that "[t]he parties agree that if either LNC or ACF, or anyone acting on their behalf, challenges the validity of, or materially breaches this Agreement, the party offended by the breach shall be relieved of its obligations under this Agreement." *Id.* at ¶ 20. In the event of a breach, the Agreement gave the non-breaching party the right to pursue legal remedies.

Upon LNC's relinquishment of its Head Start grant, DHHS designated an interim grantee to operate the Head Start program from July 1998 through July 1999. Although the interim grantee hired some of LNC's former employees, the grantee did not hire all of LNC's staff, including plaintiffs.

In July 1999, plaintiffs filed suit in the Eastern District of Pennsylvania. For jurisdictional reasons, the parties stipulated that the matter be transferred to this court. Plaintiffs filed a complaint in this court on

April 7, 2000. In their complaint, plaintiffs allege that the government made an offer to plaintiffs that if LNC voluntarily relinquished its grant, ACF would warrant that the interim grantee would hire LNC's employees through June 1999. Plaintiffs contend that each and every plaintiff accepted the alleged offer. Plaintiffs further maintain that they detrimentally relied upon ACF's offer and in consideration of the agency's offer for employment, plaintiffs accepted and agreed to relinquish the grant. Moreover, plaintiffs claim that defendant's actions constituted a breach of the employment agreement between plaintiffs and defendant and they therefore seek lost wages and punitive damages, among other things.

On June 13, 2000, defendant filed a motion to dismiss for lack of jurisdiction and failure to state a claim upon which relief can be granted. Plaintiffs filed their response thereto on July 10, 2000. Defendant submitted its reply brief on October 13, 2000. Included in defendant's reply brief is the Declaration of Mr. Lett. Mr. Lett declares, *inter alia*, that he did not release the June 16, 1998 Agreement to any person or entity, in particular to the plaintiffs for the matter before this court. Mr. Lett also states that he spoke with the DHHS employees in the ACF section who had access to the Agreement and the employees verified that they had not released the Agreement to plaintiffs, inconsistent with the Agreement's terms.

On November 5, 2001, this court ordered the parties to submit supplemental briefing addressing how the fact that this case involves a grant as opposed to a contract might impact the parties' legal arguments. Accordingly, the parties filed supplemental briefing addressing said inquiry.[1] This court held oral argument in this matter on January 17, 2002.

## DISCUSSION

### I. Defendant's motion to dismiss pursuant to RCFC 12(b)(1)

#### A. Standard for a motion to dismiss under Rule 12(b)(1)

Defendant first argues that this court does not have subject matter jurisdiction over plaintiffs' claim, pursuant to Rule 12(b)(1). Defendant contends that it is manifest from plaintiffs' complaint and attachments that no contract exists between plaintiffs and defendant; consequently, there is no jurisdiction in this court because plaintiffs' complaint is not "well-plead". Given the foregoing, defendant submits that plaintiffs' claim can be resolved based upon the allegations in their complaint, including the attached exhibits. Defendant objects to the use of any evidence outside of the complaint or further fact-finding to resolve this matter.

Under circumstances where a defendant contends that the complainant has not properly plead the existence of a contract, the court might face the dilemma of determining (1) whether it should take jurisdiction based on the allegations set forth in the complaint and proceed to determine whether plaintiffs fail to state a claim upon which relief can be granted, pursuant to Rule 12(b)(4), or (2) whether it should resolve the matter simply based on whether there is subject matter jurisdiction, under Rule 12(b)(1). *See Maniere v. United States,* 31 Fed.Cl. 410, 413–15 (1994) (discussing the two approaches to a motion to dismiss pursuant to Rule 12(b)(1) and under what circumstances this court may utilize the "factual attack doctrine" and look to further evidence to determine whether there is subject matter jurisdiction or take jurisdiction based on whether the complaint is "well-plead"). However, in instances, such as the one currently before the court, where defendant argues that there is a lack of privity of contract between plaintiffs and the government, the court must look at this matter as a jurisdictional issue and resolve the controversy pursuant to the standards set forth in Rule 12(b)(1). *See Martinez v. United States,* 48 Fed.Cl. 851, 860 (2001) (finding that privity "must be established as an initial threshold" before the court can analyze the elements of a contract since if there is lack of privity, this court lacks jurisdiction to entertain the claim). This is so because privity is a jurisdictional prerequisite in that it equates to a waiver of sovereign immunity on the

---

1. The parties' supplemental briefs will be herein- after noted as "Pl. Supp." and "Def. Supp.".

part of the government. *Nat'l Leased Hous. Assoc. v. United States,* 105 F.3d 1423, 1435–36 (1997); *Malone v. United States,* 34 Fed. Cl. 257, 260 (1995). As such, this court will articulate the standards for a Rule 12(b)(1) motion.

Jurisdiction may be challenged by the parties or raised by the court at any time, and if jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3). In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), this court, as plaintiff argues, must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, the plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Cubic Def. Sys., Inc. v. United States,* 45 Fed.Cl. 239, 245 (1999) (citing *Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583 (Fed.Cir.1993); *Reynolds,* 846 F.2d at 748; *Maniere,* 31 Fed. Cl. at 413).

Despite the basic premise that the court must construe all material facts in favor of the plaintiff, if the movant challenges the facts set forth in the complaint, the court may allow such an attack based upon the factual attack doctrine. *Maniere,* 31 Fed.Cl. at 413 (citing *Reynolds,* 846 F.2d at 747). This doctrine permits exceptions to the requirement that the court accept the complaint's allegations as true. *See id.* (citing *Eastern Trans–Waste v. United States,* 27 Fed.Cl. 146, 148 n. 1 (1992); *Goolsby v. United States,* 21 Cl.Ct. 629, 631 (1990)). This court has explained:

> Such exceptions, referred to under the collective rubric of *factual attacks,* exist in cases where a jurisdictional determination on the pleadings alone would be unfair.

Such cases might arise where the merits of a case are inextricably interwoven with the facts necessary to establish jurisdiction, or where the truth of the jurisdictional facts is disputed, or where only additional discovery can uncover necessary jurisdictional facts, or where the jurisdictional attack is based on matters outside the pleadings. *Maniere,* 31 Fed.Cl. at 413 (quoting *Eastern–Trans–Waste,* 27 Fed.Cl. at 148 n. 1) (emphasis in original). Consequently, the court may consider all evidence before it and make any factual findings necessary to adjudicate a Rule 12(b)(1) motion, including findings on matters not raised in the pleadings. *Indium Corp. of Am. v. Semi–Alloys, Inc.,* 781 F.2d 879, 884 (Fed.Cir.1985), *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986). *See also Forestry Surveys and Data v. United States,* 44 Fed.Cl. 485, 492 (1999) (citing *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461 (Fed.Cir.1998); *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991)).

In the instant matter, defendant questions whether there is privity of contract between the parties. This issue appears to fit under the rubric of factual attacks in that by questioning whether there is privity, defendant attacks a jurisdictional fact asserted by plaintiffs, since privity of contract is a jurisdictional prerequisite. *See Martinez,* 48 Fed.Cl. at 860 (stating that privity is a jurisdictional prerequisite). Also, as stated, this court is entitled to look at all evidence when it is presented with the question of whether there is subject matter jurisdiction. *See Forestry Surveys,* 44 Fed.Cl. at 492. As such, despite defendant's protestations, to determine whether there is privity and hence, subject matter jurisdiction, this court will look beyond plaintiffs' complaint to all of the evidence submitted by the parties.

**B. Court of Federal Claims' Jurisdiction**

The Tucker Act delineates this court's jurisdiction. 28 U.S.C. § 1491 (1994). The Tucker Act does not create a substantive right to recover money damages in this court; rather, it allows recovery for claims founded on the Constitution, an act of Con-

gress, regulation promulgated by the executive department, or any express or implied contract with the United States. 28 U.S.C. § 1491(a)(1); *Ky. Bridge & Dam, Inc. v. United States,* 42 Fed.Cl. 501, 516 (1998) (citing *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *United States v. Testan,* 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (*en banc* ), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984)).

### C. Privity of contract does not exist between plaintiffs and defendant

Defendant first advances that a contract does not exist between plaintiffs and the government. The government bases this argument upon the elements required for the formation of a contract, contending that in the complaint and evidence submitted by plaintiffs, there is an absence of mutual intent to contract inasmuch as there is no indication of an offer, acceptance, or consideration. As a result, defendant not only argues that there is no contract between the parties, but also that there is no privity of contract between plaintiffs and the government.

Plaintiffs oppose, asserting in oral argument that the government made two sets of agreements—one agreement with LNC and another with plaintiffs. Specifically, plaintiffs rely upon the March 25, 1998 letter from the government to LNC wherein Mr. Lett stated that the Regional Office was committed to continuing the Head Start program and services without interruption and that "[i]f LNC agrees to relinquish the program, services for children and employment for staff will continue without interruption." Pl. Opp. Exh. A at 1. Plaintiffs also allege that this agreement was verbally repeated by Mr. Lett at a meeting on or about May 22, 1998, which most of the plaintiffs and other staff as well as the LNC Board of Directors and Policy Council attended. Additionally, plain-

tiffs contend that at the May 22, 1998 meeting, Mr. Lett raised and discussed the issue of potential lawsuits and appeals. Plaintiffs further rest their argument on the April 17, 1998 letter from Mr. Lett to Dr. Elmore of LNC wherein Mr. Lett articulates that he believes that it is in the best interest of LNC, the Head Start program, and the children that LNC voluntarily forsake their grant and reiterates that if LNC relinquishes the grant, ACF would "pledge to work cooperatively with the Board of Directors, LNC staff and the Policy Council to ensure continued services to families in the LNC service area if the Board decides to relinquish the grant." Pl. Opp. Exh. B. at 2. The letter continues, stating that Mr. Lett's "commitment still remains: maintenance of service to children and families and continuity of employment for LNC staff." *Id.*

Plaintiffs assert that based upon the two aforementioned letters and the May 22, 1998 meeting, they did not challenge LNC's voluntary relinquishment of the grant pursuant to contract rights substantively created for plaintiffs by 45 C.F.R. § 1303 which governs appeal procedures for Head Start grantees. Hence, plaintiffs conclude that their action or more precisely, their inaction, in conjunction with the government's alleged offers arising from the letters and the meeting resulted in a "mixed oral and written agreement" between plaintiffs and defendant.[2]

■ A party may only bring a breach of contract action in this court, pursuant to the Tucker Act, if the party has privity of contract with the government. *See Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir.1998), *cert. denied, Sherman Park Apts. v. United States,* 528 U.S. 820, 120 S.Ct. 62, 145 L.Ed.2d 54 (1999); *Martinez,* 48 Fed.Cl. at 860; *Wrona v. United States,* 40 Fed.Cl. 784, 786 (1998); *Malone,* 34 Fed.Cl. at 260; *Etchey v. United States,* 15 Cl.Ct. 152, 154 (1988). Privity of contract has been defined as " 'that connection or relationship which exists between two or

---

2. Although in plaintiffs' opposition brief it appears that they also base their contentions upon Exhibit C, the Agreement between LNC and the government, at oral argument, plaintiffs indicat-

ed that their contentions are based upon the two letters from Mr. Lett to LNC and the May 22, 1998 meeting which most LNC staff attended.

more contracting parties.'" *Etchey*, 15 Cl. Ct. at 154 (quoting *Black's Law Dictionary* 1362 (4th ed.1968)). Privity of contract is a jurisdictional prerequisite insofar as when it is established, the court can then find that there has been a waiver of sovereign immunity on the part of the government. *See Nat'l Leased Hous.*, 105 F.3d at 1436 (stating that the inevitable result of finding privity of contract is to "trigger a waiver of sovereign immunity"). Consequently, if this court determines that there is no privity of contract, it also finds that there is neither an express nor implied contract between the government and the complainant. *Etchey*, 15 Cl.Ct. at 154 (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550 (Fed.Cir. 1983)).[3]

■ Despite the fact that plaintiffs assert that there are two agreements—one between the government and plaintiffs and another between LNC and the government—the court does not find the existence of a contract between plaintiffs and the government because there is no privity of contract between the two parties. Neither the March 25, 1998 letter nor the April 17, 1998 letter creates privity of contract between plaintiffs and defendant. The government letters are not addressed to plaintiffs; nor do the letters indicate that Dr. Elmore is acting both on behalf of the LNC Board, and on behalf of the LNC employees, despite plaintiffs' claim that LNC acted based on its membership. *See First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed.Cir.1999) (finding that there was no privity of contract between shareholders and the government when the Amended Agreement was only between the savings bank, not with the shareholders); *Malone*, 34 Fed.Cl. at 260–61 (determining that privity did not

exist where the government was not a signatory on the contract with plaintiff even though the government was the source of funding and imposed certain requirements on both plaintiff and the contracting party). Also, throughout the letters, Mr. Lett repeatedly refers to those actions LNC needed to take with regard to the voluntary relinquishment of the Head Start grant. The letters do not indicate that there is any action that plaintiffs or any other LNC employee was required to take in order for the voluntary relinquishment to occur. *See Admiralty Constr., Inc. v. Dalton*, 156 F.3d 1217, 1221–22 (Fed.Cir.1998) (finding that the government's contract requiring a contractor to provide a bond evidenced "an implied contract between the government and the contractors" and could not be construed to mean that the government "intended to undertake obligations" with the subcontractor).

In addition, this court disagrees with plaintiffs' contention that 45 C.F.R. § 1303 (1998), which governs appeal procedures for Head Start grantees who have been denied refunding, gives them a substantive right to sue the government. Title 45 C.F.R. section 1303.15 (1998) sets forth the appeal procedures for a grantee denied refunding. The entire section is dedicated to what actions the *grantee* must perform in order to ensure a properly submitted appeal. 45 C.F.R. § 1303.15. Most importantly, the regulation states that "[t]he appeal may be made only by the Board of Directors of the grantee or by an official acting on behalf of such Board." 45 C.F.R. § 1303.15(e). Furthermore, the regulations define grantee as "the local public or private non-profit agency which has been designated as a Head Start agency under 42 U.S.C. § 9836 and which has been granted financial

---

**3.** Both an express contract and an implied-in-fact contract require the court to find: "'(1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance.'" *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed.Cir.1998) (citing *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir.1990); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984); *Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474, 482 (1976)). When the government is a party, there is a fourth requirement that must be met: "[t]he government representative whose

conduct is relied upon must have actual authority to bind the government in contract." *Id.* (citing *City of El Centro*, 922 F.2d at 820). However, it is unnecessary for this court to examine each of these elements. Instead, the court must first determine whether there is privity of contract since privity is in question and is also a prerequisite for jurisdiction. *See Martinez*, 48 Fed.Cl. at 860 (stating that "[e]ven before the above elements [of a contract] can be analyzed, though, privity between the parties at bar must be established as an initial threshold"). *See also Cienega Gardens*, 194 F.3d at 1239.

assistance by the responsible HHS official to operate a Head Start program." 45 C.F.R. § 1303.2 (1998).

Nothing in the regulation's language demonstrates that plaintiffs have a contractual right to sue the government. The regulation only contemplates the actions that the grantee must take concerning an appeal for a denial of refunding. Given that the government does not require plaintiffs to take any action regarding appeals for Head Start grant funding, it cannot be said that 45 C.F.R. § 1303 gives plaintiffs substantive contractual rights to sue the government. *See Admiralty Constr.*, 156 F.3d at 1221–22.

■ The court also observes that plaintiffs are not contractually bound to the government as a result of the government providing funding for LNC's Head Start program. When the government gives a grant, it is doing so in its sovereign capacity. *See Aries Info. Sys., Inc. v. United States*, 228 Ct.Cl. 893, 1981 WL 21522 (1981) (citing *D.R. Smalley & Sons, Inc. v. United States*, 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied*, 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967) and *G–Lam Corp. v. United States*, 227 Ct.Cl. 764, 1981 WL 21446 (1981) for the proposition that an agency relationship does not exist between the government and the entity receiving federal funds simply because the government establishes standards. Rather, the government gives the grant as a " 'gift or gratuity' " and there is no enforceable contractual obligation against the government). Hence, the funds are a "gift or gratuity" rather than a contractual obligation. *Id.* Consequently, no "agency relationship" could exist between the government and the entity receiving the funds simply based on the entity's receipt of federal funds. *DeRoche v. United States*, 2 Cl.Ct. 809, 812 (1983) (relying upon *D.R. Smalley,* among other precedent, for the proposition that the government, by necessity, when disbursing federal funds, establishes standards and requirements and has oversight over the funds; this does not necessarily make the government contractually liable because the government "is not liable for damages resulting from acts performed in its sovereign capacity"). In other words, since the government did not have an agency rela-

tionship with LNC based upon LNC's receipt of government funding for its Head Start program; it follows then that LNC could not act on behalf of the government in employing plaintiffs. Thus, plaintiffs and the government did not have a direct contractual relationship based upon the government's granting Head Start funds or the Head Start regulations.

In light of the above, this court finds no privity of contract between plaintiffs and defendant based upon the March 25, 1998 and April 17, 1998 letters inasmuch as the letters, although written by the government, do not evidence the government's intent to be bound contractually to plaintiffs. *See Martinez,* 48 Fed.Cl. at 860 (quoting *Cienega Gardens,* 194 F.3d at 1241, " '[w]e are mindful that to find privity of contract, we must find on the part of HUD the type of direct, unavoidable contractual liability that is necessary to trigger a waiver of sovereign immunity, the inevitable result of finding privity of contract' ").

■ The court also does not find that the alleged oral contract created any privity of contract between plaintiffs and the government. Plaintiffs argue that at the meeting on May 22, 1998, Mr. Lett made an offer of employment to plaintiffs. Specifically, plaintiffs allege that at the May 22, 1998 meeting, Mr. Lett reiterated his statements contained in the March 25, 1998 letter to Dr. Elmore. Nevertheless, as with the letters, there is no evidence that during this meeting, the government contractually bound itself to plaintiffs. If, as plaintiffs allege, Mr. Lett reiterated the March 25, 1998 letter, it cannot be said that the government bound itself contractually to plaintiffs because Mr. Lett's statements at the meeting would have concerned LNC's voluntary relinquishment of the grant, the actions that LNC must take in that regard, and what actions the government would take as a result of LNC's decision. As with the letters, plaintiffs have not proffered any evidence demonstrating that in the meeting Mr. Lett specifically addressed plaintiffs and plaintiffs' actions regarding voluntary relinquishment of LNC's Head Start grant. In fact, at oral argument, the court asked plaintiffs' counsel how would the government know that plaintiffs' lack of a re-

sponse (i.e., failure to contest LNC's voluntary relinquishment) showed the government there was a contract between plaintiffs and the government. In response, plaintiffs' counsel stated that there were a number of employees in attendance at the meeting and when the issue was discussed, the LNC employees did not state that they would contest the voluntary relinquishment or appeal such action; instead, "it was obvious from the factual conclusion to be drawn at that meeting that there was going to be no problem at that point" and "the fact that they did not sue prior to the time of that agreement being executed is evidence of acceptance." Tr. 30:21–25; 31:1–6.[4]

This court is disinclined to agree with plaintiffs' counsel's assessment of the meeting. Plaintiffs have not demonstrated why it was "obvious" that plaintiffs' silence at the meeting would lead to a conclusion that the government intended to contractually bind itself to plaintiffs or that the government considered the meeting to be anything more than an informational session held as a courtesy to plaintiffs and other LNC employees. Given the above, the court sees no reason to stray from the line of reasoning applied by the court in its review of the March 25, 1998 and April 17, 1998 letters.

Moreover, this court cannot ignore the existence of the June 16, 1998 agreement between LNC and the government concerning LNC's voluntary relinquishment of the Head Start grant in spite of plaintiffs' claim during oral argument that its case is based only on the two aforementioned letters and the May 22, 1998 meeting. In fact, plaintiffs initially relied upon that Agreement in order to establish their claim that there is a contract between the parties. *See* Pl. Opp. Exh. C; Tr. 27:21–25; 28:1–3. However, a review of the Agreement does not evidence privity of contract between plaintiffs and defendant.

 A grant agreement is an enforceable contract in this court. *City of Manassas v. United States*, 224 Ct.Cl. 515, 633 F.2d 181, 184 (1980), *cert. denied,* 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980) (citing *State of Texas v. United States*, 210 Ct.Cl. 522, 537 F.2d 466 (1976)). However, "in such enforcement the government is bound only by its express undertakings." *Id.* First and foremost, paragraph 18 of the Agreement states that the Agreement "represents the entire agreement between LNC and ACF and any and all prior understandings or agreements between the parties that pertain to the subject matter of this Agreement are fully superseded hereby." Pl. Opp. Exh. C. at 5, ¶ 18. Thus, this paragraph states that it is the parties' intent that this Agreement be the binding agreement for the parties. *See Herman v. United States*, 229 Ct.Cl. 475, 1981 WL 22031 (1981) (finding where parties entered into a written agreement subsequent to an oral agreement and the written agreement specified that the conditions were set forth completely in the contract, the written agreement was an integrated contract and any oral agreement had no weight). Second, the Agreement is signed by Mr. Lett on behalf of ACF and by Dr. Elmore on behalf of the Board of Directors of LNC. There is nothing in the signatory space that signifies that Dr. Elmore signed the Agreement on behalf of plaintiffs as well as on behalf of LNC's Board of Directors. *Id. See Hazra v. United States*, 231 Ct.Cl. 835, 1982 WL 25322 (1982) (finding that plaintiff was not a party to the contract where the agreement was expressly between the government and the non-profit, despite plaintiff's signed statement that he understood the agreement's terms).

Furthermore, throughout the Agreement, LNC and ACF are reflected as the parties' primary concern. For example, "in consideration of mutual covenants contained herein and intending to be legally bound hereby," the parties agreed, *inter alia*, to: (1) the tasks either LNC or ACF are to complete to effectuate the agreement; (2) the confidentiality terms of the agreement; (3) the parties' full understanding of the agreement; and (4) the waiver of LNC's appeal rights, among other things. Pl. Opp. Exh. C at 1–6, ¶¶ 1–5, 7–17, 20, and 22. In contrast, the

---

**4.** "Tr.__:__" refers to the numbered pages and lines of the transcript of the oral argument held on

January 17, 2002.

Agreement mentions the staff of LNC only once, in paragraph six. Paragraph 6 states that: "ACF warrants that the interim grantee agrees to offer employment to qualified LNC staff, excluding the Executive Director and administrative management personnel, through mid-June 1999." Pl. Opp. Exh. C at 2, ¶ 6.

Although paragraph 6 addresses the employment of LNC staff, the paragraph in no way indicates that there is a separate agreement between plaintiffs or other LNC staff and the government. Paragraph 6 does not offer outright employment to plaintiffs; instead LNC staff's future employment with the interim grantee is contingent upon whether the employee is "qualified." Merely because this paragraph mentions the employment of some LNC staff does not mean that there is a direct contract with plaintiffs; instead, it means that the *interim grantee* will hire qualified LNC personnel. The Agreement itself is still only between LNC and ACF. *See Sallee v. United States,* 41 Fed.Cl. 509, 513–14 (1998) (finding that simply because the Incentive Program Manual required the contractors to distribute a percentage of shared savings to employees did not give the employees of the contractor privity of contract with the government when the awarding of the incentives was left up to the contractor). Consequently, not only was there no direct contract between the government and plaintiffs based upon this paragraph of the Agreement or the Agreement as a whole, paragraph 6 merely demonstrates the obligation of the government to oversee the disbursal of federal funds and to establish standards for the project. By doing so, even though the government "warrants" that qualified personnel would be hired by the interim grantee, this oversight of grant funds is more akin to the government acting in a sovereign capacity than the government entering into an enforceable contract with plaintiffs. *See Aries Info. Sys.,* 228 Ct.Cl. 893, 1981 WL 21522 (1981) (citations omitted) (finding that no contractual relationship existed between the government and plaintiff

where plaintiff agreed to furnish services to a company that administered a program which was paid for by a grant from the government because: (1) the contract was between plaintiff and the company administering the program rather than between plaintiff and the government; (2) the grant award did not mention the existence of a contract between the parties; and (3) the facts were reminiscent of prior cases in which, under similar circumstances (i.e., the government's grant of funding for a project), the government's grant was held to be a "gift or gratuity" rather than an enforceable contractual obligation); *DeRoche,* 2 Cl.Ct. at 812.

Given the foregoing, this court finds that the Agreement also fails to demonstrate that there is privity of contract between plaintiffs and the government.[5] In fact, the Agreement evidences that if there is any privity of contract present, it is between the government and LNC, not plaintiffs. Accordingly, because plaintiffs lack privity of contract with the government, plaintiffs must demonstrate that an alternative ground for jurisdiction in this court exists.

### D. Plaintiffs are not third-party beneficiaries

As an alternative position, plaintiffs claim that if there is no direct privity of contract between plaintiffs and the government, plaintiffs are third-party beneficiaries of the Agreement between the government and LNC; thus, this court has jurisdiction over their action. Plaintiffs' argument is untenable in this regard, as well.

The doctrine of third-party beneficiary status allows claimants who do not have privity of contract to bring a suit if the party demonstrates that the contract "not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Glass v. United States,* 258 F.3d 1349, 1354 (Fed.Cir.2001). *See also State of Montana v. United States,* 124 F.3d 1269, 1273 (1997) (agreeing with this court that a party claim-

---

5. It is appropriate to note at this juncture that even if plaintiffs were deemed to be parties to the Agreement, plaintiffs breached the confidentiality requirement of the Agreement by the filing of this lawsuit. In accordance with the terms of the Agreement, any breach of the confidentiality relieves the party offended by the breach of its obligations under the Agreement.

ing third-party beneficiary status must demonstrate that the contract reflects an "express or implied intention of the parties to benefit the third-party"). The party's burden of proof is quite heavy in that the party must show that the agreement at issue " 'was intended for [the party's] *direct* benefit.' " *Glass*, 258 F.3d at 1354 (quoting *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195 (1912) (emphasis added)). This requirement distinguishes direct beneficiaries of a contract from indirect beneficiaries of an agreement insofar as an indirect beneficiary is, "at most, an incidental beneficiary with no rights to ·enforce the contract." *Id.* (citing Restatement (Second) of Contracts § 302, Illustration 2). Despite this requirement, the Federal Circuit has agreed with this court that in order to maintain third-party beneficiary status, the complainant does not have to prove that the contract gave the plaintiff a "direct right to compensation or the power to enforce that right against the promisor." *Id.* The plaintiff need only show that the contract was intended to directly benefit him or her. *Id.* at 1355. That is, the contract need not specifically or individually identify the intended beneficiary; rather, the intended beneficiary "must fall within a class clearly intended to be benefitted" by the contract. *Montana*, 124 F.3d at 1273. The court may determine whether the party falls within this class by inquiring whether it is reasonable that the beneficiary rely "on the promise manifesting an intention to confer a right on him." *Id.* (citing Restatement (Second) of Contracts § 302(1)(b) cmt. d.).

■ Since the court has determined that all agreements prior to the finalization of the Agreement between LNC and the government were superseded by the Agreement, the court need only examine whether plaintiffs are third-party beneficiaries to the Agreement between LNC and defendant. As suggested by a reading of the case law, the contract must reflect the intent of the parties, express or implied, to benefit the party claiming third-party beneficiary status *and* the intent to benefit that party, directly. *Glass*, 258 F.3d at 1354. Here, plaintiffs fail to meet either requirement.

The only relevant section of the Agreement upon which plaintiffs rely is paragraph 6. As stated, paragraph 6 states that "ACF warrants that the interim grantee agrees to offer employment to qualified LNC staff, excluding the Executive Director and administrative management personnel through mid-June 1999." Pl. Opp. Exh. C at 2, ¶ 6. A most important term in paragraph 6 is the term "qualified" since the meaning and application of the word may be sufficiently subjective to preclude plaintiffs from third-party beneficiary status. By its nature, qualified means that one must meet certain requirements. *See* WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 961 (1st Ed.1988). Conversely, if an individual does not meet certain requirements, he or she must be considered *un*qualified. Hence, the use of the term "qualified" in paragraph 6 presents limitations as to which LNC staff members the interim grantee would offer employment. In other words, because of the presence of the term "qualified," paragraph 6 presents the possibilities that: (1) all of LNC staff would be qualified and thus offered employment; (2) some of LNC staff would be qualified and be offered employment while others who are unqualified would not be offered employment; and (3) none of LNC staff would be qualified and none of the staff would be offered employment. Consequently, paragraph 6 does not guarantee that plaintiffs were to receive an offer of employment by the interim grantee as there was the distinct possibility that some or even all of LNC staff, including plaintiffs, would not be considered "qualified". Also, paragraph 6 specifically excludes certain upper-level LNC staff, including one of the plaintiffs, Willa Webb, Executive Director of LNC. This limitation is yet another indicator that not all of the plaintiffs were guaranteed employment by the interim grantee. Given these contingencies placed on plaintiffs' future employment with the interim grantee, the court cannot say that the Agreement reflects the intent of the parties to benefit plaintiffs as there was no absolute guarantee that any or all of the plaintiffs would be offered employment.

Moreover, and more importantly, even if it could be said that the Agreement, in particu-

lar, paragraph 6, reflects the intent to benefit plaintiffs, it cannot be said that the intention of the agreement is to benefit plaintiffs directly. In *National Leased Housing Association v. United States*, 32 Fed.Cl. 454 (1994), the issue before this court was whether the owners of Section 8 housing projects were third-party beneficiaries in a two-tier contracting scheme. In this project, the United States Department of Housing and Urban Development (HUD) contracted with a local housing authority and, in turn, the housing authority contracted with a project developer (landlords). *Nat'l Leased Housing Assoc.*, 32 Fed.Cl. at 457–58. Based upon this arrangement, the plaintiffs contended that since they entered into contracts with HUD agents, even if they failed to have privity with the government pursuant to an agency theory, they were third-party beneficiaries to the contracts between HUD and the local housing authority. *Id.* at 462. This court determined that allowing the plaintiffs to bring the suit directly "would not effectuate HUD's intent" when the department entered into the contracts with the local housing authority. *Id.* To this end, the court looked to the purpose of the section 8 program, which was "directed at securing quality housing for low-income families." *Id.* at 463. Given this purpose, the court determined that "the tenants of the low-income housing are more appropriately characterized as the 'intended beneficiaries' of the [contracts with HUD] than are the project owners." *Id.*

The Federal Circuit agreed with this court's reasoning. In *National Leased Housing Association v. United States*, 105 F.3d 1423 (Fed.Cir.1997), a related case with the same named plaintiffs, the court was again confronted with a two-tier contract scheme. The Federal Circuit looked toward *Katz v. Cisneros*, 16 F.3d 1204 (Fed.Cir.1994) in which a two-tier contracting scheme was involved. *Nat'l Leased Housing Assoc.*, 105 F.3d at 1436. In *Katz*, the Federal Circuit determined that " '[i]f there is a third party beneficiary at all, it is probably the low-income tenants.' " *Id.* (citing *Katz*, 16 F.3d at 1210). In *National Leased Housing Association*, the Federal Circuit saw no reason to deviate from the *Katz* court's reasoning and

determined the same in its review of the trial court's decision. *Id.* at 1436–37.

Although a two-tier contracting arrangement is not involved in this case, the reasoning behind both the Federal Circuit and the COFC's opinions in the *National Leased Housing* cases is applicable to this matter. Just as the main purpose of the contracts with HUD were to provide low-income housing, and thus the tenants were the "intended beneficiaries," here, the more appropriate third-party intended beneficiaries are the families who participate in the Head Start program. The Head Start program's purpose is to "promote school readiness by enhancing the social and cognitive development of low-income children . . . ." 42 U.S.C. § 9831. The Head Start grant for LNC was to provide educational, nutritional, and social services to preschool children of low-income families in the Philadelphia area. This purpose is seen as a concern throughout the written communications between LNC and the government.

Although the Agreement signed in June 1998 by LNC and ACF supersedes any other agreements and understandings between the parties, reviewing the March 25, 1998 and April 17, 1998 letters between the parties offers insight into the purpose of the June 1998 agreement. The March 25, 1998 letter states that ACF is committed to Head Start in North Philadelphia, to the children and the funding and that Mr. Lett recognizes "the positive impact and the promise that Head Start holds for children and parents and that [he] will not let this promise go unfulfilled." Pl. Opp. Exh. A at 1. Mr. Lett also states that if the LNC Board relinquishes the program, ACF will maintain service without interruption and "[t]o assure that the program reopens in September, as usual, we will select another Head Start agency to operate the program on an interim basis. Under these arrangements, LNC staff and component coordinators would be hired to provide the program through mid-June 1999 and children would receive the full Head Start program." *Id.* at 2. Similarly, Mr. Lett's April 17, 1998 letter to Dr. Elmore reiterates his commitment to maintain Head Start services to children and families and

"continuity of employment for LNC staff." Pl. Opp. Exh. B at 2. Also, the letter reflects Mr. Lett's concern about LNC's "financial viability, fiscal management, its program weaknesses and general problems in day-to-day operations." *Id.* at 1. Both of the letters indicate that it is the concern of the government that Head Start's purpose and commitment to the community continue and that to ensure that the services would continue, without interruption, LNC staff would be hired.

The Agreement furthers this analysis by stating that "the parties have concluded that it would be in the best interest of the Head Start children and families in North Philadelphia for a new grantee to conduct the Head Start program in that community in the future." Pl. Opp. Exh. C at 1. Furthermore, "the parties are committed to ensuring a smooth and orderly transition of the Head Start program in North Philadelphia from LNC to the new grantee ..." *Id.* To this end, the Agreement sets forth the manner in which this orderly transition will take place. Paragraph 6 is a part of this list and it is the only paragraph in which employment of any LNC staff is mentioned. Given that the Agreement reflects that its purpose is to "promote the best interests of the Head Start children and families in North Philadelphia" and the Agreement only mentions the hiring of plaintiffs in order to effectuate a smooth transition of the program between LNC and the interim grantee, it is clear that the intended beneficiaries of this Agreement are the children and families that benefit from the Head Start program.

This determination is further bolstered by the fact that it would not have been reasonable for plaintiffs to rely upon the Agreement as a "promise as manifesting an intention to confer a right" on them. *See State of Montana,* 124 F.3d at 1273. The confidentiality terms expressed in paragraph 18 of the Agreement state that "the parties agree that the terms and conditions of this Agreement shall remain confidential as between the parties and that they shall not disclose them to any person or entity." Pl. Opp. Exh. C at 4, ¶ 18. The parties to the Agreement are LNC and ACF, not plaintiffs. Given that the terms of the Agreement could not be disclosed to outside parties, it would have been unreasonable for plaintiffs to rely upon an agreement the terms of which were not to be disclosed to them. Also, because this agreement superseded all other agreements, plaintiffs could not rely upon any previous agreements between LNC and the government.[6] As such, since plaintiffs could not have reasonably relied upon the Agreement for the promise of employment and the Agreement itself does not reflect an intent to either expressly or impliedly *directly* benefit plaintiffs, paragraph six's presence in the Agreement treats plaintiffs more like "incidental" beneficiaries rather than intentional beneficiaries to the Agreement. This court finds that plaintiffs cannot maintain third-party beneficiary status and hence, this court does not have jurisdiction over plaintiffs' claim pursuant to the Tucker Act.

In light of the above, it is unnecessary for this court to address defendant's Rule 12(b)(4) motion or the parties' contentions regarding the elements of contract formation.

## CONCLUSION

Accordingly, it is hereby **ORDERED** that:

(1) Defendant's Motion to Dismiss plaintiff's claim alleging breach of contract is **GRANTED.**

(2) The Clerk's office is directed to enter judgment for defendant, dismissing plaintiff's complaint filed April 7, 2000.

---

6. Indeed, even if the March 25, 1998 and April 17, 1998 letters were considered to be implied-in-fact contracts plaintiffs could not rely upon those letters. *See City of Cincinnati,* 153 F.3d at 1377 (stating that "an implied-in-fact contract arises when an express offer and acceptance are missing, but the parties' conduct indicates mutual assent"). Where an express contract exists, an implied-in-fact contract which covers the same subject matter cannot exist. *Trauma Serv. Group*

*v. United States,* 104 F.3d 1321, 1326 (Fed.Cir. 1997) (citing *Atlas Corp. v. United States,* 895 F.2d 745, 754–55 (Fed.Cir.1990); *Reforestacion de Sarapiqui v. United States,* 26 Cl.Ct. 177, 190 (1992)). In this instance, both letters, the March meeting, and the June 1998 agreement cover the same subject matter. Hence, even if the letters or the oral meeting were considered implied-in-fact contracts, they could not govern the instant case.

(3) Each party shall bear its own costs.

